Louis J. ROUSSEL, Plaintiff,

v.

TIDELANDS CAPITAL CORPORATION, et al., Defendants.

Civ. A. No. 76–G–1724–S.

United States District Court, N. D. Alabama, S. D.

July 29, 1977.

Robert M. Alton, Jr., Alton & Leavell, Montgomery, Ala., for plaintiff.

J. Darrell Jordan, pro se.

Richard H. Gill, Hobbs, Copeland, Franco & Screws, Montgomery, Ala., for Gibraltar Life Ins. Co. (dismissed 1/31/76).

Charles M. Crook, Smith, Bowman, Thagard, Crook & Culpepper, Montgomery, Ala., and Drayton N. Nabers, Jr., and George G. Lynn, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for American Tidelands Life Ins. Co.

## MEMORANDUM OPINION

GUIN, District Judge.

This cause is before the court on plaintiff's motion for rehearing or for new trial and motion for recusal. This action was filed solely as a derivative action on behalf of American Tidelands Life Insurance Company ("American Tidelands") by the plaintiff, Louis J. Roussel, against nineteen individual and corporate defendants. The purported occasion for filing this action was a proposed tender offer by American Tidelands for approximately 380,000 shares or some 51 percent of the outstanding stock of The Gibraltar Life Insurance Company of America, of Dallas, Texas. Roussel is a resident of New Orleans, Louisiana. He is an experienced businessman and financier with interests in insurance, banking, real estate and oil and gas enterprises. The defendant, American Tidelands, in whose behalf plaintiff sought to maintain this action, is an Alabama insurance company with its principal place of business in Birmingham, Alabama. Approximately 67.5 percent of its stock is owned by the defendant, Tidelands Capital Corporation ("Tidelands Capital"), a Louisiana business corporation which is a publicly held holding company. The balance of American Tidelands' stock is owned by some 4,000 minority shareholders, including plaintiff, who owns approximately .9 percent of American Tidelands' outstanding stock. Approximately 97 percent of Tidelands Capital's total assets are its holdings of American Tidelands

stock. The complaint alleged that the proposed tender offer would render American Tidelands insolvent and force it into receivership. The tender offer was consummated shortly after the complaint was filed. On February 1, 1977, acting on defendants' motion to dismiss, this court entered an order dismissing with prejudice this derivative action under Rule 23.1 of the Federal Rules of Civil Procedure on the ground that plaintiff did not fairly and adequately represent the interests of the defendant, American Tidelands, for reasons which are reviewed below in the discussion of the motion for rehearing.

■ The issue presented by defendants' motion to dismiss, insofar as relevant to the motion for rehearing, is whether it appears that plaintiff fairly and adequately represents the interests of American Tidelands' shareholders in enforcing the rights of American Tidelands. The court has been guided by definitive pronouncements of the United States Supreme Court on the nature of the plaintiff in a derivative lawsuit. In the leading case of *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1948), the Court described the derivative plaintiff as follows:

> [A] stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion.

337 U.S. at 549, 69 S.Ct. at 1227, 93 L.Ed. at 1538. It is in this light that the court finds plaintiff cannot meet the adequacy of representation requirement of Rule 23.1.

The evidence demonstrates that the plaintiff had sought to gain control of Tide-

lands Capital and its American Tidelands subsidiary during the year prior to the filing of this lawsuit. In the fall of 1975, a Louisiana group, financed by the plaintiff, commenced a take over bid for Tidelands Capital. This group sent out some one or two thousand postcards and made hundreds of telephone calls to Tidelands Capital stockholders soliciting the sale of Tidelands Capital stock. Altogether, plaintiff or companies controlled by him or his family acquired in excess of 20 percent of Tidelands Capital's outstanding stock.

American Tidelands' and Tidelands Capital's management resisted this take over bid. They reported the activities of plaintiff's group to the Securities and Exchange Commission, which initiated an investigation of plaintiff's activities. They also turned to the defendant, Western Preferred Corporation ("Western Preferred"), of Denver, Colorado, and negotiated for it to make a tender offer for Tidelands Capital's stock in order to prevent plaintiff from acquiring control of Tidelands Capital and American Tidelands. Thereafter, Western Preferred (through its wholly-owned subsidiary, Western Preferred Life Insurance Company, also a defendant), made two public cash tender offers for Tidelands Capital stock, and through these offers acquired approximately 62 percent of Tidelands Capital's outstanding stock.

These tender offers resulted in Western Preferred's acquiring control of Tidelands Capital and American Tidelands. They defeated the efforts of plaintiff's group to acquire control of these companies. Following the failure of plaintiff's group to gain control of these companies, plaintiff swore in testimony before the Securities and Exchange Commission that the Western Preferred group "will be in the court-house a hell of a long time."

Plaintiff's activities, including this lawsuit, demonstrate his intention to fulfill that declaration. First, he sought to have the acquisition of control of American Tidelands by Western Preferred disapproved by the Alabama Commissioner of Insurance. When the Commissioner approved the ac-

quisition, plaintiff appealed to the Alabama courts. His appeal was dismissed. Then, in August of 1976, when American Tidelands proposed the Gibraltar tender offer, plaintiff filed this lawsuit to block its consummation. When a reorganization between American Tidelands and Tidelands Capital was announced in November 1976, plaintiff amended his complaint herein and sought to enjoin the reorganization. Following an evidentiary hearing, this court denied plaintiff preliminary injunctive relief against that reorganization. Now, weeks after final judgment of dismissal was entered in this case, he has filed motions for rehearing and for recusal.

Roussel's public record establishes a total and habitual disdain and contempt for law and fiduciary responsibility. The record shows that he has testified falsely under oath, violated the federal banking laws, violated the corporate rights of minority stockholders, and violated his fiduciary duty to minority stockholders.

In *Schmitt v. Roussel,* [*Dixie Homestead Ass'n v. Schmitt*] 181 So. 218 at 220 (Ct. App.La.1938), the Court of Appeals of Louisiana specifically found that Roussel testified falsely under oath: "[Roussel's] evidence cannot be favorably considered inasmuch as we find that he testified untruthfully . . . . The maxim 'falsus in uno, falsus in omnibus' applies and therefore no part of his statement is entitled to credence."

In 1964, the Louisiana Court of Appeals expressly found, following a Roussel takeover of a life insurance company, that his treatment of the minority stockholders of that company so flagrantly violated his fiduciary and corporate duties to the stockholders that a judicial receiver was required to be appointed to protect the stockholders from Roussel. *West v. Certified Credit Corp.,* 162 So.2d 589, 596 (Ct.App.La.1964).

Again, in *Noe v. Roussel,* 299 So.2d 481, 484 (Ct.App.La.1974), the Louisiana Court of Appeals found Roussel had breached his fiduciary duty to the minority stockholder of a real estate corporation by causing its principal asset to be sold to American Bene-

fit Life Insurance Company, a Roussel-controlled insurance company:

It is our opinion that the trial court erred in a matter of law when it concluded that the defendant, Louis J. Roussel, Jr., did not breach his fiduciary obligation to the plaintiff. . . . We find that the breach of Roussel's fiduciary obligations to his principal, Noe [the minority stockholder], had its inception with the commencement of the voluntary liquidation as shown by the dissolution resolution of July 1, 1970.

On August 23, 1976, Roussel consented to a sweeping decree, entered by the United States District Court for the Eastern District of Louisiana in an action filed by the S.E.C. charging plaintiff with two take over attempts in violation of the Williams Act, 15 U.S.C. §§ 78m–n, and involving substantially the same take over tactics as used against American Tidelands and Tidelands Capital. The S.E.C. is presently investigating Roussel in connection with his similar take over attempt of American Tidelands and Tidelands Capital.

Roussel has been charged by the United States Comptroller of the Currency with gross misconduct in connection with his control and operation of the National American Bank of New Orleans. Specifically, on July 11, 1974, the Board of Governors of the Federal Reserve System ordered Roussel to appear and answer charges of "breaches of fiduciary duty . . . involving personal dishonesty on the part of Louis J. Roussel . . . under 12 U.S.C. § 1818(e)(4)." Roussel never answered these charges; rather, he resigned as a director and officer of the National American Bank.

As stated above, the complaint in this matter alleged that the proposed tender offer would render American Tidelands insolvent and force it into receivership. This complaint was filed October 8, 1976, and, on October 13, 1976, American Benefit Life Insurance Company, a company owned and controlled by Roussel, purchased 200,000 shares of Tidelands Capital stock for approximately $264,500 (some $1.31 per share), which is one of the highest prices

per share paid for Tidelands Capital stock in at least the past five years. In testimony under oath in a hearing before the Alabama Commissioner of Insurance in January 1977, plaintiff repeatedly referred to this purchase as if it were his own. At this hearing, some three months after the Gibraltar tender offer was consummated, plaintiff stated he expected to make a profit on this purchase of Tidelands Capital stock. In light of these facts and testimony, the court can only conclude that the plaintiff's sworn averments that the Gibraltar tender offer would render American Tidelands insolvent were not made in good faith. In any event, plaintiff's conduct in causing American Benefit to purchase the Tidelands Capital stock makes it impossible for him to advance "adequately," in the language of Rule 23.1, the central contention of the complaint that the Gibraltar transaction rendered American Tidelands insolvent or otherwise damaged American Tidelands' financial position.

An additional fact leading to the court's dismissal of the complaint under Rule 23.1 is plaintiff's admission under oath in testimony before the Alabama Department of Insurance that he did not even read the complaint prior to swearing that its allegations were true. His explanation for this serious dereliction was, "Look, I run a lot of business, if I'd have to read every complaint, I'd handle it myself." The court finds that Roussel's false verification of the complaint is an additional factor indicating that plaintiff will neither adequately nor fairly represent the interests of American Tidelands' minority stockholders.

■ The foregoing findings are, according to plaintiff, irrelevant. Plaintiff's position is that he should be allowed to maintain this suit under Rule 23.1 if it appears that he has the means and will vigorously prosecute it through competent counsel. This court cannot agree. Rule 23.1 requires that representation appear to be both "fair" and "adequate." The decisions have interpreted this to mean that a court should examine any indications that there are extrinsic factors which "render it likely that the representative may disregard the interests of the class members." *Blum v. Morgan Guaranty Trust Co. of New York,* 539 F.2d 1388, 1390 (5th Cir. 1976). *See also, G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.,* 517 F.2d 24 (1st Cir. 1974), and *Nolen v. Shaw-Walker Co.,* 449 F.2d 506 (6th Cir. 1971). Typically, these extrinsic factors involve competing business interests. In this case, the court found it relevant not only that plaintiff has made investments inconsistent with the announced reasons for the suit, but that plaintiff's record in corporate transactions demonstrated a continuing and contemptuous disregard for fair play and law; that plaintiff filed this lawsuit as part of a campaign of harassment to keep the defendants "in the courthouse a hell of a long time;" and that plaintiff was too busy with other businesses to read the complaint before swearing under oath that it was true. Perhaps under different circumstances any one of these factors standing alone would not have led this court to exercise its discretion to dismiss the lawsuit. The confluence of these factors, however, convinces this court that it would be an abuse of discretion to entrust plaintiff with the responsibilities of a derivative plaintiff.

In his motion for rehearing, the plaintiff relies heavily on *Wolf v. Frank,* 477 F.2d 467 (5th Cir. 1973). In *Wolf v. Frank,* the district court, exercising its discretion, overruled defendants' motion to dismiss the derivative action based on lack of fair and adequate representation, tried the lawsuit on the merits, and rendered a judgment for plaintiffs. On appeal, defendants-appellants argued that the plaintiffs had been "economic pirates" and that the judgment in its derivative aspects should be set aside because the district court erred in not dismissing the derivative allegations under Rule 23.1. The Court of Appeals found that plaintiffs' representation had, in fact, been fair and adequate, and noted that the district court had made no findings supporting defendants' contentions, but rather had found that the defendants were the real "picaroons." The Court of Appeals went on to state that "[W]hether plaintiffs were or

were not knights in shining armor is irrelevant under Rule 23.1 of the Federal Rules of Civil Procedure so long as they fairly and adequately represented the shareholders in enforcing the rights" of the corporation in whose name the suit was derivatively filed. 477 F.2d at 476.

This court finds nothing in *Wolf v. Frank* which requires or suggests that it must allow plaintiff to proceed as a derivative plaintiff in this lawsuit. In *Wolf v. Frank*, the district court had made no findings indicating that the defendants' representation contention was in any respect valid, and it obviously appeared to the Court of Appeals that plaintiffs' representation had been fair and adequate in fact. Without employing the illustrious *Wolf v. Frank* metaphors, this court is convinced that on the facts outlined above, plaintiff is not qualified to represent American Tidelands and its minority shareholders "fairly" or "adequately."

Plaintiff asks this court to allow him to proceed, in the words of *Cohen v. Beneficial Loan Corp.*, 337 U.S. at 549, 69 S.Ct. 1221, as the "self-chosen representative" and "volunteer champion" of some 4,000 minority American Tidelands shareholders. He asks that this court order that their interests be entrusted to him, dependent upon his diligence, wisdom and integrity. Plaintiff's integrity in protecting the rights of minority shareholders has been tested in the past. Time and again the judgments of courts in his own state have found plaintiff's integrity wanting. There is no evi-

dence before the court that would justify the conclusion that in this lawsuit he will faithfully pursue the interests of American Tidelands and its minority shareholders rather than his own.

In view of its findings that plaintiff could not possibly meet the Rule 23.1 requirements of fair and adequate representation, this court finds that plaintiff's motion for rehearing or for new trial is due to be denied.

■ The motion for recusal and the supporting affidavit, set out in pertinent part below,[1] present three statutory questions, under title 28 U.S.C. § 144:[2] Was the affidavit timely filed; was it accompanied by the necessary certificate of counsel of record; and is the affidavit legally sufficient? And, while the court must examine these three issues, it must not make any inquiry into the truth of the allegations. *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). *Parrish v. Board of Commissioners of the Alabama State Bar*, 524 F.2d 98, 100 (5th Cir. 1975), *cert. den.* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188. The court finds that the requirement of certificate of counsel is satisfied but that neither legal sufficiency nor timeliness, within the meaning of the statute, is.

Under the decisions on the requirement of legal sufficiency, an affidavit may fail under two different analyses: evidentiary and substantive. Here, the affidavit cannot withstand scrutiny into either aspect of its

---

1. "It has now been brought to the attention of your affiant that Drayton Nabers contacted Judge Seybourn Lynne concerning the case against Tidelands Capital and that as a result of such contact Judge Seybourn Lynne has discussed with Judge Guin, the judge to whom this case is assigned, Judge Lynne's opinion of the merits of the matter and Judge Lynne's opinion of Louis J. Roussel, all of which has influenced Judge Guin in the decision of this case and has put the Court in the position of considering opinions not of record and not subject to rebuttal from a prejudiced source all of which has resulted in a woeful miscarriage of justice."

2. "Whenever a party to any proceeding in a district court makes and files a timely and

sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

legal sufficiency, and hence must be rejected by the court.

■ First of all, the affidavit must identify with particularity time, place, persons, and circumstances supporting the affiant's belief of personal bias against him or in favor of his opponent. This requirement of factual detail was stated by the United States Supreme Court in the *Berger* opinion, 255 U.S. at 33, 41 S.Ct. 188, and is the law today. See *Parrish,* 524 F.2d at 100, and the cases collected at Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3551, footnote 13. A minimal requirement would be sufficient detail in the affidavit that the affiant would expose himself to a charge of perjury, if he were guilty of swearing to statements that he knew to be false. If this seems a harsh requirement, it is also a necessary one, in order to prevent abuse of § 144. Mr. Justice McKenna, speaking for the *Berger* court, 255 U.S. at 33, 41 S.Ct. 230, 233, referred to the statutory requirement that the affidavit set out facts and reasons supporting the affiant's belief: "It is a precaution against abuse, removes the averments and belief from the irresponsibility of unsupported opinion, and adds to the certificate of counsel the supplementary aid of the penalty attached to perjury." Again, 255 U.S. 35, 41 S.Ct. [230] 233–34, he adverts to the requirement of detail: "Our interpretation of [the statute] has therefore no deterring consequences, and we cannot relieve from its imperative conditions upon a dread or prophecy that they may be abusively used. They can only be so used by making a false affidavit; and a charge of, and the penalties of, perjury restrain from that—perjury in him who makes the affidavit, connivance therein of counsel, thereby subjecting him to disbarment." The Supreme Court's use of perjury charges as the yardstick against which to measure the detail of an affidavit was noted by the Ninth Circuit Court of Appeals in *Grimes v. United States,* 396 F.2d 331, 333 (1968). In this circuit, the cases seem to require some degree of detail beyond this minimal level. In *Beland v. United States,* 117 F.2d 958, 960 (5th Cir. 1941), cert. den. 313 U.S. 585, 61

S.Ct. 1110, 85 L.Ed. 1541, *rehearing den.* 314 U.S. 708, 62 S.Ct. 54, 86 L.Ed. 565, *rehearing den.* 317 U.S. 710, 63 S.Ct. 205, 87 L.Ed. 566, Judge McCord was adamant: "The orderly administration of justice requires that affidavits filed under the statute be strictly construed so as to prevent abuse, and that they state facts, not baseless conclusions, showing personal bias or prejudice of the judge against the affiant." Under this evidentiary analysis, the Roussel affidavit clearly is not legally sufficient, within the meaning of § 144.

■ In addition to setting out the facts behind the affiant's belief in sufficient detail, the affidavit must meet substantive requirements of legal sufficiency. The court must determine whether the facts asserted are such that a reasonable man would infer personal bias in the trial judge either against the affiant or for his adversary. This requirement of the affidavit was set out in *Berger,* 255 U.S. at 33, 41 S.Ct. 188, and elaborated on in *Parrish,* 524 F.2d at 100. This court finds it hard to see how any "reasonable" man would find the bare and unsupported allegations of the affiant sufficiently convincing to meet § 144 standards. First, a study of the affidavit can only suggest bias on the part of Judge Lynne, and wholly fails to explain how a personal bias in this court could have been created. There is a presumption in favor of a judge's integrity and the clearness of his perception. *In re Union Leader Corp.,* 292 F.2d 381, 389 (1st Cir. 1961), cert. den. 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190. Finally, the court can take into account the fact that this affidavit contains nothing but hearsay allegations. *Hodgson v. Liquor Salesman's Union Local No. 2,* 444 F.2d 1344, 1349 (2d Cir. 1971). For these reasons, the affidavit must be rejected, under a substantive analysis, for lack of legal sufficiency.

■ The third statutory question presented by the motion and affidavit is whether they were timely filed. Section 144 specifically requires that they "shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be

shown for failure to file it within such time." This clear deadline is complicated by the fact that 28 U.S.C. § 138, amended in 1963, ended formal terms for district courts. One suggested interpretation of the requirement, then, is that affidavits be filed with "reasonable diligence." See, Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3551, at footnote 26. Some courts, including those of this circuit, have drawn the line at submission of the cause to the court for decision. Judge Bell, in *Davis v. Board of School Commissioners of Mobile County,* 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. den.* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188, made this distinction between the two disqualification statutes: "The office of the procedure under § 144 is to disqualify a judge prior to trial on motion of a party. Section 455 . . . may also be asserted by a party by motion in the trial court; through assignment of error on appeal, by interlocutory appeal, as here, or by mandamus." [Citations omitted.] *See also, Spampinato v. M. Breger & Co., Inc.,* 270 F.2d 46, 48 (2d Cir. 1959), *cert. den.* 361 U.S. 944, 80 S.Ct. 409, 4 L.Ed.2d 363, *rehearing den.* 361 U.S. 973, 80 S.Ct. 597, 4 L.Ed.2d 553. This affidavit fails to satisfy any standard. The statute clearly puts the burden on the affiant of showing good cause for failure to file in time. This affidavit was filed after an adverse determination on the merits, and yet the only explanation for the delay is the bare assertion that "It has now been brought to the attention of your affiant . . .." There is no attempt to give a detailed statement of what was said to affiant, by whom, or when. The same evidentiary requirements for legal sufficiency of the affidavit must attach to excuses for failure to file the affidavit before submission. There are strong policy reasons for strictly construing the timeliness requirement. Without such control, a party could speculate on the court's final judgment, withhold information learned before trial, and disqualify the judge if the decision went against him. Further, it is intolerable that a court should so lightly allow the adversary to be put to the expense of a second trial and face all the other problems of long delays in trying

a matter. Since the affidavit does not meet the timeliness requirement of § 144, it must be rejected.

Thus, the affidavit has been found lacking on the basis of two independent statutory requirements: legal sufficiency and timeliness. Either, and certainly both, require that plaintiff's motion for recusal be denied.

Circuit Judge Gee, in his special concurrence to *Parrish,* 524 F.2d at 106, argued that the rule of *Berger*—prohibiting a judge from any inquiry into the truth of facts asserted in an affidavit—is anachronistic. He noted the numerous interpretations of § 144 and *Berger* which have eroded the purview of the statute and "effectively rejected a liberal reading of *Berger* . . . .." He went on to suggest a distinction between the necessary step of preventing a judge from deciding whether or not he is biased and the curious further step of prohibiting an inquiry into the truth of matters asserted as "facts" within the affidavit.

> The statute's language gives fair support to the construction that the judge is not to determine bias-in-fact, and common sense supports the view that few if any humans can fairly decide whether they themselves are or are not biased in any given matter. But it is not too much to ask that a conscientious magistrate determine whether a given affidavit contains enough *truth* to fairly support a reasonable apprehension that he may be biased, or that an appellate court review that decision effectively. There is, therefore, no need to discern in § 144 a rule by which a party who really wants to do so and has the nerve can at pleasure disqualify any federal judge in a given proceeding by presenting to him a spurious set of ex parte "facts" which he cannot question—and by which his opponent can disqualify his first replacement by the same means.

524 F.2d at 106 [emphasis added].

This view was actually shared by the dissenters to the original *Berger* decision.

Mr. Justice Day, joined by Mr. Justice Pitney, argued that

As I understand the opinion of the court, notwithstanding the admissions of counsel, and the sworn stenographic report of what took place, the affidavit must be accepted, and, if it discloses matters, which if true, would tend to establish bias and prejudice, the same must be given effect and the judge be disqualified. It does not seem to me that this conclusion comports with the requirements of the statute that reasons and facts must be set forth for the consideration of the judge.

255 U.S. at 40, 41 S.Ct. at 235.

The weakness of the approach taken by the *Berger* majority becomes strikingly apparent in the light of this case. Here a party formally declared by the Court of Appeals of Louisiana to be a perjurer—publicly sworn to the cause of tying this defendant up in litigation, who has admitted to filing the verified complaint in this action without bothering to read it, and whose record in published appellate court decisions clearly discloses the fiduciary breaches of which he has been guilty—has filed this motion to recuse weeks after the final judgment of dismissal of his case. He has supported it with the barest sort of hearsay—in verbiage which seems carefully calculated to avoid exposure to prosecution for perjury. Further, he has chosen to include in the affidavit contumacious assertions of improper conduct by the Honorable Seybourn H. Lynne, Senior Judge and former Chief Judge of this district. The judicial world, at least, is aware of the long and honored career of Judge Lynne. He has served this district, and the thousands of litigants who have obtained justice in his court, as a United States District Judge for over 31 years, and as Chief Judge of this court for 20 years. He was twice presented with opportunities to be elevated to the United States Court of Appeals for the Fifth Circuit, and twice decided to remain at the trial level in order to remain closer to the people. He continues, as Senior Judge, to carry as heavy a civil caseload as any other judge in this district. It is indeed a shame that such a man, who has so devoted himself to justice and the service of us all, can be attacked with impunity by an individual of plaintiff's demonstrated character. It is a disgrace that this court, which is more certainly aware than any other agency or person that there has *not* been an improper effort to affect the decision of this case, cannot invoke an official inquiry into the allegations in this affidavit or base its decision, at least in part, on what this court in fact *knows,* that the hearsay allegation of misconduct is *false.*

The Supreme Court trusted the availability of perjury charges to forestall abuse of the statute. Though this motion to recuse, and supporting affidavit, are due to be denied on the untimeliness of their assertions and their legal insufficiency, the statute has been abused and the damage has not been entirely corrected. The Western Preferred group's time in the courthouse has been successfully extended. The financial damage defendant has suffered on the securities market, as a direct result of the extended life of this lawsuit, would be difficult or impossible to calculate. Unblemished reputations, of judges and counsel, have been slurred. There has been mapped for unscrupulous litigants a path for successful and ensured extension of strike litigation. Worse, the judicial system has been used for improper purposes and public confidence in it eroded that much more.

Accordingly, it is ORDERED, ADJUDGED and DECREED that plaintiff's motions for rehearing and recusal be, and the same hereby, are DENIED.