619 F.2d 588
 Norman H. DAVIS et al., For Themselves And On Behalf Of All
Other Shareholders Of Community Medical Systems Corporation
And On Behalf Of All Other Shareholders of Comed, Inc.,
Plaintiffs-Cross Appellants,
v.
COMED, INC., et al., Defendants-Cross Appellees.
 Nos. 77-3216, 77-3217.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 16, 1979.
Decided April 16, 1980.
Rehearing Denied July 8, 1980.
 
 F. Bruce Abel, Steer, Strauss, White & Tobias, Cincinnati, Ohio, for Norman H. Davis, et al., Plaintiffs-Appellees in Case No. 77-3216; Plaintiffs-Cross-Appellants in Case No. 77-3217.
 Daniel M. Bennie, Brumleve, DeCamp & Wood, Cincinnati, Ohio, for Maurice E. Olen & Charles S. Scheuerman, Defendants-Appellants in Case No. 77-3216; Defendants-Appellees in Case No. 77-3217.
 Michael S. Duty, Cincinnati, Ohio, for Comed Inc., Community Medical Systems Corp. and Mediworld Inc.--Defendants-Appellants in Case No. 77-3216.
 Robert C. Porter, Jr., Porter & McKinney, Cincinnati, Ohio, for himself, a Defendant-Appellee in Case No. 77-3217.
 Before WEICK, LIVELY and KEITH, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 This is a complex shareholder's derivative action brought in the District Court by plaintiff Davis and his wife in behalf of themselves and in behalf of all other shareholders of Comed, Inc. (Comed) and in behalf of all other shareholders of Community Medical Systems Corporation (C.M.S.). None of the other shareholders were named in the complaints.
 
 
 2
 Davis and his wife then owned only one hundred shares of Comed common stock which they later sold and transferred to Comed subsequent to the trial for $2500.00. Davis also owned 2975 shares of C.M.S., the parent company of Comed.
 
 
 3
 In the suit, the plaintiffs sought to rescind Comed's sale to University Research Corporation of real estate located in Cincinnati, Ohio, and known as the Emerson A. North Hospital property asserting fraud and lack of authority of said corporation to sell the property and to recover compensatory and exemplary damages for improprieties in the distribution of the sales proceeds, and for violation of the Securities Exchange Act of 1934 and regulations promulgated by the Securities and Exchange Commission thereunder, 15 U.S.C. Section 78j(b) and Rule 10(b)5.
 
 
 4
 The defendants included the above-named corporations, along with certain others and a number of individuals. The defendants all filed answers to the complaints denying any wrongdoing. More than four years after the complaint was filed and after extensive discovery, including the taking of numerous depositions and the filing by plaintiffs of a Third Amended and Supplemental Complaint (the filing of a Fourth Amended and Supplemental Complaint was denied), the District Court heard additional evidence. Many exhibits were offered. The court adopted Findings of Fact and Conclusions of Law. The court first commented on discourteous conduct of plaintiffs' attorney Abel and defendants' attorney Kerman and Eynon to each other and to opposing witnesses during discovery proceedings, which required admonition by the court as it reflected "adversely upon such counsel and upon the legal profession as well."
 
 
 5
 With respect to the purchase and sale of the Emerson A. North Hospital, the court found:
 
 
 6
 2. In August, 1969, Comed purchased the Cincinnati property from Emerson A. North Hospital. Comed purchased the property for the sum of Eight Hundred Thousand Dollars ($800,000.00) and obtained a one year loan from the Provident Bank of Cincinnati in the sum of Nine Hundred Twenty-four Thousand Dollars ($924,000.00). In February of 1970, the loan of Provident Bank was extended for an additional year to expire February 1, 1971.
 
 
 7
 During 1970 Comed attempted to sell the premises to Emerson A. North, Inc., the non-profit corporation. Discussions reached a point where a purchase price agreeable to both parties was negotiated and there remained only the obtaining of appropriate financing.
 
 
 8
 In November of 1970, Emerson A. North, Inc. determined that it could not obtain the proper financing and withdrew its offer of purchase. During the same period negotiations were in progress with a group of individuals in Washington, D.C. who operated as University Research Corporation. During December of 1970 and January of 1971, a deal was negotiated whereby University Research Corporation, operating in the name of an Ohio subsidiary corporation to be organized, agreed to purchase the real estate from Comed for the sum of Nine Hundred Seventy-five Thousand Dollars ($975,000.00) and purchase the hospital leasehold and personal property from Emerson A. North, Inc. for the sum of Fifty Thousand Dollars ($50,000.00). Financing in the sum of Eight Hundred Forty-five Thousand Dollars ($845,000.00) was obtained from Home State Savings & Loan Corporation in Cincinnati and the remaining amount of purchase price was financed by a second mortgage obtained from the seller, Comed, in the sum of One Hundred Thirty Thousand Dollars ($130,000.00). App. pp. 167, 168
 
 
 9
 The subsidiary of University Research Corporation was Cincinnati Mental Health Institute (C.M.H.I.), an Ohio corporation.
 
 The court further found:
 
 10
 4. The payment of Nine Hundred Seventy-five Thousand Dollars ($975,000.00) by C.M.H.I. to Comed represented adequate consideration for the premises in question. No director, officer or shareholders of C.M.H.I. was an officer, shareholder, or director of Comed, C.M.S.C. or Mediworld. Individual defendants Olen, Scheuerman, Van Laare and Sullivan at no time were shareholders of or interested in either University Research Corporation of C.M.H.I. Defendant Robert Porter served as attorney for C.M.H.I. in its organization as an Ohio corporation and occupied the position of statutory agent. Neither his function as an attorney nor his appointment as statutory agent represented a conflict of interest with his service as attorney and secretary of Comed.
 
 
 11
 Mr. Porter's representation of Emerson A. North, Inc. was separate and apart from his activities in behalf of C.M.H.I. and were consistent with his duties as its President, member of its Board of Directors, and attorney. Mr. Porter did not represent Comed in its transactions with C.M.H.I. but confined himself to negotiations on behalf of Emerson A. North, Inc. His conduct was consistent with his obligations to that corporation. App. p. 169Mediworld, an Alabama corporation, owns the controlling interest in Comed. C.M.S. was the parent of Comed and originally owned a controlling interest in Mediworld.
 
 
 12
 The court further found and upheld provisions in the contract of sale being Clause XVII which indemnified the purchasers, U.R.C. and C.M.H.I., from all costs that might be incurred in defending any shareholder's derivative action seeking to contest the sale.
 
 
 13
 The court upheld the validity of the sale and denied plaintiff's prayers for accounting and for rescission of transactions. It awarded judgment against defendants Olen and Scheuerman in the sum of $48,750.00 in favor of the shareholders of Comed, for an alleged improper payment to F.A.M.E., Inc. and distributed to Olen and Scheuerman as a commission for their efforts in selling the hospital property. The court awarded attorneys fees to Bruce Abel, attorney for the plaintiffs, in the amount of $30,000.00, and costs to Davis. Shareholders of Comed were awarded $50,000.00 in exemplary damages against Olen and Scheuerman.
 
 
 14
 Defendants have appealed to this court and the plaintiffs have cross-appealed. The record on appeal consists of 10 volumes of pleadings and other papers; 19 volumes of depositions; 13 volumes of trial transcripts; 3 volumes of Joint Appendix; one box of videotape. We affirm the judgment of the District Court approving the sale of the hospital and denying rescission of transactions and accounting and remand for further proceedings consistent with our opinion.
 
 
 15
 * In our opinion, the District Court reached the correct result in upholding the validity of the sale of the hospital property to University Research Corporation (U.R.C.), title to which was taken in the name of its subsidiary C.M.H.I., an Ohio corporation. A fair and reasonable price, namely $1,025,000.00, was paid for the hospital property. U.R.C. and C.M.H.I. were innocent purchasers for value without notice of any defects in the title and without knowledge of any claims made by the plaintiffs or of the shareholders plaintiffs purported to represent. Likewise, the mortgagee, Home Savings and Loan Corporation in Cincinnati, which financed the sale by loaning $845,000.00 on first mortgage, was an innocent mortgagee in good faith without notice of any defects. The Provident Bank in Cincinnati which financed the acquisition was also an innocent mortgagee in good faith without notice of defects.
 
 
 16
 It is clear that with all these innocent people involved a court would not grant rescission and plaintiffs and their counsel must have been aware of that fact.
 
 II
 
 17
 Plaintiffs have since the trial allowed Comed to redeem their shares and they sold, assigned and delivered to Comed their 100 shares of stock in that company for $2,500.00. They no longer have standing to sue for the benefit of the shareholders of Comed, and are not entitled to participate in the recovery of the shareholders of Comed. Plaintiff Davis, however, still owns 2975 shares of the common stock of C.M.S., the parent of Comed, which he claims affords standing for him to maintain the action for the benefit of C.M.S. The trouble with this claim is that the action for rescission which he instituted was wholly unfounded as the District Court properly held because it involved innocent purchasers and mortgagees for value. The shareholders of C.M.S. have overwhelmingly ratified the challenged transaction. The action of Davis has already subjected Comed to substantial liability to the innocent purchasers for value U.R.C. and C.M.H.I. for a considerable amount incurred in the cost of defense of this suit which is provided under the contract of indemnity.
 
 
 18
 It further was established by substantial evidence that Davis was disqualified from bringing this derivative action because of his conduct and conflicts of interest. In instituting this derivative action, Davis was supposed to be acting in the best interests of and for the benefit of the shareholders of Comed and C.M.S. when in truth he was not. Instead, he was acting for his own selfish interests and as a front for others whose interests were inimical to the interests of shareholders.
 
 
 19
 It was in the best interest of the shareholders of both Comed and C.M.S. that the contract of sale of the hospital property to U.R.C. and C.M.H.I. be completed and the proceeds of sale be properly and promptly distributed. The gist of plaintiff's derivative suit, however, was to rescind the sale which was not in the best interests of the shareholders of Comed or C.M.S. Plaintiff's suit subjected Comed to liability in a substantial amount on its indemnity contract with U.R.C. and C.M.H.I. for the cost of defending this derivative action.
 
 
 20
 The interests of Comed and C.M.S. were shown by the shareholders meetings of each company held after the suit had been filed. Comed's shareholders on December 28, 1972, overwhelmingly ratified the challenged transactions by a vote of 13,702 to 100, with only plaintiff's shares cast in opposition. Plaintiff's interest was further shown by the filing of an action in the Common Pleas Court of Hamilton County, Ohio, to have the value of their 100 shares appraised resulting in an appraisal of $1,900.00. Plaintiffs later consented to the redemption of their shares by Comed for $2,500.00 whereby they no longer had any interest in Comed.
 
 
 21
 On October 15, 1971, the shareholders of C.M.S. at a meeting overwhelmingly ratified the challenged transactions by a vote of 2,723,844 to 20,540 votes, the only opposition thereto were the shares of Davis and the shares of his cohort Datches. Davis and his cohorts were interested in acquiring the hospital property for themselves if possible at a foreclosure sale or by other means and they had plans for developing the property for their own benefit. This is not in the best interests of the shareholders of Comed and C.M.S.
 
 
 22
 Davis was a judgment creditor of C.M.S. for $10,483.45 having recovered judgment for salary in the state court in Missouri where he instituted proceedings to collect the judgment. His cohorts, who also had claims, filed an involuntary petition in bankruptcy against C.M.S. in the Federal District Court in St. Louis, Missouri, which was dismissed by the District Court on its merits because the petitioners had not proven an act of bankruptcy.
 
 III
 
 23
 It is obvious that plaintiffs' standing to prosecute this derivative action could be challenged on the ground that Davis "does not fairly and adequately represent the interests of similarly situated shareholders in enforcing the corporations' rights," as required by Federal Rule of Civil Procedure 23.1 for maintenance of a stockholder's derivative suit. Robinson v. Computer Servicenters, Inc., 75 F.R.D. 637, 641 (N.D.Ala.1976).
 
 
 24
 Rule 23.1 "is intended to make explicit that adequacy of representation is a requirement of derivative as well as class actions." Robinson, id. As the Supreme Court stated in Cohen v. Beneficial Loan Corp., 337 U.S. 541, 549-550, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949):
 
 
 25
 ". . . a stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom, and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion. The Federal Constitution does not oblige the state to place its litigating and adjudicating processes at the disposal of such a representative, at least without imposing standards of responsibility, liability and accountability which it considers will protect the interests he elects himself to represent."The court in Roussel v. Tidelands Capital Corp., 438 F.Supp. 684, 688 (N.D.Ala.1977), explained that "Rule 23.1 requires that representation appear to be both 'fair' and 'adequate'. The decisions have interpreted this to mean that a court should examine any indications that there are extrinsic factors which 'render it likely that the representative may disregard the interests of the class members.' " Indeed, "while a plaintiff is not necessarily disabled to bring suit simply because some of his interests extend beyond that of the class, the court may take into account outside entanglements that render it likely that the representatives may disregard the interests of the other class members." Blum v. Morgan Guaranty Trust Co. of New York, 539 F.2d 1388, 1390 (5th Cir. 1976). See also Hornreich v. Plant Industries, Inc., 535 F.2d 550, 552 (9th Cir. 1976) (court entitled to rely upon affidavits submitted by parties, as well as pleadings, in determining adequacy of representation).
 
 
 26
 A court may and should take into consideration "outside entanglements making it likely that the interests of the other stockholders will be disregarded in the management of the suit." G. A. Enterprises, Inc. v. Leisure Living Commun., Inc., 517 F.2d 24, 27 (1st Cir. 1975). "Should any 'ulterior' motives of plaintiffs which are inimical to their ability to adequately represent the other shareholders become manifest, the Court is free to make appropriate adjustments." First American Corporation v. Foster, 51 F.R.D. 248, 250 (N.D.Ga.1970).
 
 
 27
 In Nolen v. Shaw-Walker Company, 449 F.2d 506, 510 (6th Cir. 1971), we expressly rejected early decisions "which held that a shareholder's motive in bringing a derivative action was immaterial to his right to sue in federal court if the corporation had been injured by the wrongful act of an officer and director." Judge McCree, who wrote the opinion for the court, emphasized that "those cases were not decided under Fed.R.Civ.P. 23.1 which expressly states that the action 'may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders * * * in enforcing the right of the corporation.' " See also Wolf v. Frank, 477 F.2d 467, 476 (5th Cir. 1973) ("Whether plaintiffs were or were not knights in shining armor is irrelevant under Rule 23.1 . . ., so long as they fairly and adequately represented the shareholders in enforcing the rights of IGB.")
 
 
 28
 "In prosecuting a derivative claim a shareholder acts in the stead of the corporation, as a corporate surrogate seeking vindication of a corporate right." Sweet v. Bermingham, 65 F.R.D. 551, 553 (S.D.N.Y.1975). Moreover, as the Supreme Court has noted, "The proceeds of the action belong to the corporation and it is bound by the result of the suit. The heart of the action is the corporate claim." Ross v. Bernhard, 396 U.S. 531, 538-39, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970).
 
 
 29
 The court in duPont v. Wyly, 61 F.R.D. 615, 624 (D.Del.1973), stressed that "the assurance demanded by due process and Rule 23 is that the representative party in a class action be free of any interest which holds the potential of influencing his conduct of the litigation in a manner inconsistent with the interests of the class." See also Seiden v. Nicholson, 69 F.R.D. 681, 687 (N.D.Ill.1976); Shulman v. Ritzenberg, 47 F.R.D. 202, 207 (D.D.C.1969).
 
 
 30
 The courts have examined several factors or elements in determining whether a particular derivative plaintiff can provide the requisite fair and adequate representation. Typically, the elements are intertwined or interrelated, and it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of 23.1 (although often a strong showing of one way in which the plaintiff's interests are actually inimical to those he is supposed to represent fairly and adequately, will suffice in reaching such a conclusion). Among the elements which the courts have evaluated in considering whether the derivative plaintiff meets Rule 23.1's representation requirements are: economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.
 
 
 31
 A major "type of antagonism requiring denial of certification is clear economic antagonism between representative and class." Schnorbach v. Fuqua, 70 F.R.D. 424, 433 (S.D.Ga.1975). See also Roussel, supra at 688, ("Typically, these extrinsic factors involve competing business interests.") Many courts have confronted situations of economic antagonism, frequently involving competition between two entities in which the derivative plaintiff is involved. In William Penn Man. Corp. v. Provident Fund for Income, Inc., 68 F.R.D. 456, 459 (E.D.Pa.1975), "prior to being fired from his position with Fund, Somers informed Porteous that he desired to obtain control of Fund . . . At and after the time he was fired, Somers took an active part in a committee of the Fund's shareholders which sought to wrest control of the Fund's management from Porteous." Thereafter, Somers organized Penn and submitted a bid for the Fund's management contract, despite the fact that Penn had never managed a mutual fund. Somers also discussed the possibility of a proxy fight in opposition to designation of Channing as the Fund's new investment manager. The Court noted that plaintiffs, who sought rescission of the Channing contract, did not challenge Channing's qualifications as an investment advisor, and did not allege either that the Fund could be managed more effectively or that a change in the investment advisor would be beneficial to the Fund. The Court ruled that plaintiffs' prayer for rescission, apparently to furnish them with another opportunity to secure a $500,000.00 per annum management contract for themselves, rendered plaintiffs inadequate representatives of the other shareholders. (The Court rejected plaintiffs' contention that their special, additional interests did not disqualify them from representing the class but rather gave them "increased zest with which to 'wage judicial battle.' ")
 
 
 32
 Similarly, in Roussel v. Tidelands Capital Corp., 438 F.Supp. 684 (N.D.Ala.1977), the court dismissed the derivative action because plaintiff did not fairly and adequately represent the interests of the defendant American Tidelands. During the year preceding commencement of the lawsuit, plaintiff had sought to gain control of Tidelands Capital and its subsidiary, American Tidelands. Plaintiff financed a group which undertook a take-over bid for Tidelands Capital, but Tidelands resisted by turning to Western for help. Western, via its own tender offer, acquired control of Tidelands Capital and American Tidelands, and thereby defeated the efforts of plaintiff's group to acquire control. Plaintiff then sought to have Western's acquisition of control of American Tidelands disapproved by the Alabama Commissioner of Insurance, and, when the Commissioner approved the transaction, plaintiff appealed to the Alabama courts. Subsequently, when American Tidelands proposed another tender offer, plaintiff filed the derivative action to block its consummation.
 
 
 33
 In Nolen v. Shaw-Walker Company, 449 F.2d 506, 509 (6th Cir. 1971), Lindland, who was found to be in control of the litigation, served as a director of American Seating Co. and as an executive officer of Textron during the gestation of this dispute. His "purpose in urging the maintenance of this action was to force Shaw Walker and his father's estate to accede to a merger between the defendant Company and some other company listed on the New York Stock Exchange, preferably American Seating or Textron." Plaintiff's counsel had indicated that, if a merger could be arranged between the company and Detroit Steel Corp., plaintiff and those associated with her "would be satisfied."
 
 
 34
 The derivative plaintiff in Quirke v. St. Louis-San Francisco Railway Company, 277 F.2d 705, 708 (8th Cir. 1960), was a stockholder in two railroads, one of which purchased the stock of the other. He filed a derivative action against the purchaser because he believed "that the purchase of Central of Georgia stock by the Frisco was advantageous to the Frisco and its stockholders but the sale of Central of Georgia stock by that Company was detrimental to the company and its stockholders of whom he was one." The Eighth Circuit held that "he had such adverse interests as made him an unfit person to maintain this class action."
 
 
 35
 The court ruled in Robinson v. Computer Servicenters, Inc., 75 F.R.D. 637, 641 (N.D.Ala.1976), that "Robinson's interests are actually . . . in acute conflict with the interests of both the CSI shareholders and the corporation itself." The court found that "Robinson . . . is much more than a mere shareholder in another corporation. He is, in fact, the owner of a business that has been judicially determined to be in direct competition with CSI," Id. at 643, to the detriment of CSI and its shareholders.
 
 
 36
 "The many faceted relationship between Mr. duPont and UCC suggests that this suit may be an attempt to open still another front in a wide ranging battle having objectives unrelated to those shared by the class." duPont v. Wyly, 61 F.R.D. 615, 622 (D.Del.1973). Stressing that "duPont is a competitor of UCC," the Court held that "where a person is a member of two groups with distinct and conflicting relevant interests and, on balance, his economic interests in one substantially outweighs his economic interest in the other, he is unfit to represent the second group in a class suit." Id. at 623.
 
 
 37
 As indicated previously, the courts have also scrutinized the remedy sought, and its implications, in assessing plaintiff's qualifications as a derivative representative. In Schnorbach v. Fuqua, 70 F.R.D. 424, 433 (S.D.Ga.1975), the Court observed that "the type of antagonisms which has . . . frequently led to the denial of certification is a conflict over alternative remedies, particularly where a plaintiff primarily seeks rescission while many in the class desire only damages." The district court in Guttmann v. Braemer, 51 F.R.D. 537 (SDNY 1970) noted that, of those owning shares of the United States Lines at the time of its merger into Walter Kidde and Company, there had emerged four categories of individuals depending on what the individual had done with his Lines shares subsequent to the merger. Plaintiff, who alleged that the proxy statement circulated prior to the merger vote contained untrue statements and material omissions, was a member of the category of shareholders who did not surrender their Lines shares in connection with the merger. Nevertheless, he sought to maintain the suit as a class action, representing all those who had owned Lines stock at the time of the merger, including: those Lines shareholders who surrendered their Lines shares in return for Kidde securities; those who sought appraisal of their Lines shares (and may have been awarded sums as a result); and those who submitted their Lines shares in exchange for Kidde securities and voted for the merger. Plaintiff, as a continuing Lines shareholder, urged rescission of the merger and reconstitution of the Lines as a separate entity; in the alternative, if the court determined that equitable considerations precluded rescission of the merger, plaintiff sought damages for himself and all public shareholders of the Lines.
 
 
 38
 The Guttmann court perceived "diverse and conflicting interests within the proposed class which preclude our finding that plaintiff would fairly and adequately protect the interests of all members of the proposed class . . . at least as long as plaintiff urges rescission." Id. at 538. The Court noted that "the potential for conflict between plaintiff's interest and the interest of the great majority of the class he seeks to represent arises out of the fact that plaintiff continues as a Lines stockholder, where as the great majority have exchanged their Lines shares for Kidde securities." Id. Finding that "plaintiff prefers an entirely different type of relief from that which many other members of the proposed class would want," the Guttmann court explained:"Unlike plaintiff, many Lines stockholders who surrendered their shares in return for Kidde securities might be vigorously opposed to rescission and want damages or nothing. Some Lines stockholders, for instance, have already received money awards for their shares by way of appraisal and others who exchanged have undoubtedly sold their Kidde shares since the merger and hence are not in a position to surrender them in return for Lines shares." Id. at 539.
 
 
 39
 In the same vein, the court in Tober v. Charnita, Inc., 58 F.R.D. 74, 80 (M.D.Pa.1973), pointed out that "those class members who are seeking rescission may be opposed to a monetary settlement which could be in the best interests of those who seek damages." Likewise, in a context strikingly similar to the case sub judice, the court in William Penn Man. Corp. v. Provident Fund for Income, Inc., 68 F.R.D. 456, 459-60 (E.D.Pa.1975), the court stressed that:
 
 
 40
 " . . . there is nothing which even suggests that a rescission of the Channing contract would be in the best interest of the shareholders. On the other hand, the investment advisory contract generates approximately $500,000 per annum in commissions and its rescission would provide plaintiffs a second opportunity to secure this lucrative contract without conferring any benefit on the shareholders as a class.
 
 
 41
 "Because of the overriding objectives of Somers and Penn to obtain the management contract for Penn, they will be less likely than the other shareholders to accept a cash settlement even though such a settlement might be in the best interest of the class.
 
 
 42
 "As long as plaintiffs' prayer is for recission, there appear to be conflicting interests within the proposed class which preclude our finding that 'plaintiff(s) would fairly and adequately protect the interests of all members of the proposed class . . . ' "
 
 
 43
 With respect to the criterion of whether the derivative representative is fronting for the real party in interest, this Circuit has found that a plaintiff does not fairly and adequately represent the shareholders when the action is in fact controlled by another individual, with antagonistic economic interests. In Nolen v. Shaw-Walker Company, 449 F.2d 506, 509-510 (6th Cir. 1971), this Court encountered a situation in which Lindland was actually in control of the litigation instituted by the named plaintiff. The Court noted that Nolen "apparently followed Lindland's lead in several important respects, such as in the selection of counsel. Lindland also served as liaison between Johnson, Nolen and the other shareholders who supported the suit and as counsel's source of information for the complaint." Judge McCree pointed out that plaintiff Nolen admitted that Lindland "has been sort of in charge of things", while "Lindland himself speaks of 'the shareholders I represent' and the protection of 'the interest of our clients.' "
 
 
 44
 Finally, several courts have discussed what criteria are important in determining whether plaintiff has the support of other shareholders. In Guttmann v. Braemer, 51 F.R.D. 537, 539 (SDNY 1970), the court emphasized:
 
 
 45
 " . . . although plaintiff's suit was begun six months ago, no members of the other proposed subclasses have indicated an interest in the suit by instituting independent suits of their own, which frequently happens where the claims are believed to be meritorious and in the interests of the class. Nor has there been any indication that members of these other proposed subclasses desire to be represented by plaintiff."
 
 
 46
 This Court again in Nolen v. Shaw-Walker Company, 449 F.2d 506, 507 (6th Cir. 1971) pointed out that:
 
 
 47
 "Seventy-nine of the Company's 84 shareholders, who together owned approximately 96% of the outstanding stock, indicated that they did not wish to be represented by Nolen in the class action and that they did not believe Nolen would fairly and adequately represent their interests in the derivative action."
 
 
 48
 In a feasibility study, Davis noted that the zoning of the front 12 1/2 acres of the hospital site would permit hi-rise apartments. He advocated development of the land around the hospital to make it income-producing. Davis was invited to the Datche home to speak to a group about the hospital's conditions and potential. Ruth Datche described Davis as part of her team, and she stated that they intended to invite Davis to join the purchase group. John Datche said that the purchase group included Norman Davis, and that Davis would have been involved in the development. As alluded to previously, Davis had indicated that he would benefit, perhaps to the tune of $200,000.00, by supervising the development envisioned in his feasibility study. This opportunity could be achieved by rescinding the sale to CMHI, thereby enabling acquisition by the Datche group.
 
 
 49
 Intertwined with the issue of economic antagonism is the remedy which Davis sought. Attorney Abel deposed that "the remedy is rescission in this case, and we are seeking the remedy of rescission, and that is the primary remedy." Abel cryptically noted that "there have been discussions regarding what would happen if the property were rescinded and whether there could be a resale."
 
 
 50
 Throughout the litigation, the plaintiffs focused upon the hospital sale. The Original Complaint was totally geared to rescinding the sale to CMHI, and that emphasis remained through the Third Amended Complaint. Indeed, the pattern of the amended complaints clearly suggests that rescission of the hospital sale was the real concern of the litigation, that the addition of CMS as a defendant, and the allegations concerning Olen's entry onto the CMS scene, were mere afterthoughts. Plaintiff's Statement in the Pretrial Order charged that the sale was for inadequate consideration, and that the fiduciaries did not make an honest effort to obtain the highest price; plaintiffs did not, however, seek an accounting for the post-sale disbursements.
 
 
 51
 That the primary motive for the suit was to obtain rescission of the sale to CMHI, to facilitate acquisition by the Datche group, is demonstrated by the fact that monetary damages would be sufficient remedy for inadequate purchase price, or the payment to F. A. M. E., or perhaps even for the shuffling of assets. Praying for rescission here is tantamount to an admission of ulterior motives.
 
 
 52
 It is also important to look at the ramifications of rescission. Comed may have gone into bankruptcy, and would have been unable to secure the loan which was needed to redeem the minority shares. On the other hand, rescission may have led to foreclosure on the Provident or the Home Savings and Loan mortgage, which, in turn, would have resulted in a diminished price, enabling the Datche group to purchase the hospital at a bargain. Davis repeatedly indicated that he favored foreclosure and bankruptcy.
 
 
 53
 A very significant factor herein is that Davis has been involved in litigation with the defendants in several courts. This derivative action appears to be just one more skirmish in a larger war between Davis and some of the defendants, perverted into a weapon which, as its highest and best use, would be leverage in his other lawsuits. Plaintiff's own words virtually admit this conflict between the derivative action and his other litigation.
 
 
 54
 It should be pointed out that Davis and his cohorts, represented by Attorney Abel, were not the only bad actors or wrongdoers in this case. They were just the principal ones. The defendants against whom the District Court rendered judgment for the wrongly paid finders fee or commission and for $50,000 exemplary damages were certainly in pari delicto. Except for the fact that there were innocent parties in this case, namely, the purchaser of the hospital property and the two mortgagees, we believe that the case would have been thrown out of court by the District Judge. The money judgments did result in benefits to the shareholders of the two companies and resulted largely by reason of legal services rendered by Attorney Abel. On the other hand, because Davis and his cohorts had interests inimical to those of the other shareholders and caused the corporation to incur expenses in defending this suit where the primary purpose was to obtain rescission and cause the corporation to incur liability on its contract of indemnity with the purchaser CMHI for its costs of defending this suit, this conduct is sufficient to limit their participation in the recoveries on behalf of shareholders, to limit their recovery of costs to those expended for services actually beneficial to the corporation and shareholders and to limit similarly the award of fees to their Attorney Abel.
 
 
 55
 The record is not in such shape that we are able to review these matters. The case will be remanded for further consideration of these allowances and for the court to give some explanation of the basis for the allowances of fees and costs to the plaintiff and their attorney.
 
 
 56
 In our opinion, the factual findings of the District Court on the issues of liability and damages are supported by substantial evidence and are not clearly erroneous. Its conclusions of law are correct.
 
 
 57
 The judgment of the District Court is affirmed in all respects except as above indicated and the cause is remanded for further proceedings consistent with the opinion. No costs allowed.
 
 
 58
 LIVELY, Circuit Judge, concurring.
 
 
 59
 I concur in the result and write separately to state my understanding of the holding of the court. Though the court states that the plaintiffs' standing to prosecute this action "could be challenged on the ground that Davis 'does not fairly and adequately represent the interests of similarly situated shareholders in enforcing the corporation's rights,' " there is no holding that Davis was in fact disqualified from maintaining the action. Such a holding would have required dismissal, since no other shareholders joined in the complaint. Rather, the court finds that Davis, because of conflicts between his personal interests and those of other shareholders and his ulterior motives in bringing the action, should have a limited participation in the fruits of the lawsuit. This is a reasonable provision which is also applicable to the claim for attorney's fees. Cf. Clark v. Lomas & Nettleton Financial Corp., 79 F.R.D. 641 (N.D.Tex.1978).
 
 
 60
 The district court had jurisdiction over the parties and the subject matter. Though it developed that the plaintiffs were not "knights in shining armor," Wolf v. Frank, 477 F.2d 467, 476 (5th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), they were shareholders of Comed at the beginning of the lawsuit and of C.M.S. throughout. Their derivative action brought to light several acts of the defendants which had resulted in illegal withdrawals and diversions of corporate assets. Though the plaintiffs had a selfish motive in bringing the action, the district court acted within its discretion in permitting them to continue to act on behalf of similarly situated shareholders. Having jurisdiction in this equitable action the court was free to decide the entire dispute and order complete relief. Alexander v. Hillman, 296 U.S. 222, 242, 56 S.Ct. 204, 211, 80 L.Ed. 192 (1935).