**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The Boathouse at Breach Inlet, LLC, by and through its member, Laurence O. Stoney, Jr., Appellant,

v.

Richard S.W. Stoney, individually and as Member-manager of The Boathouse at Breach Inlet, LLC and Crew Carolina, LLC, Defendants,

and

Theodore Stoney, Jr., individually as Trustee for Richard Stoney, Jr. and Gregory G. Holmes, Third-Party Intervenors,

of whom Richard S. W. Stoney, individually and as Member-manager of The Boathouse at Breach Inlet, LLC is the Respondent.

Appellate Case No. 2020-001203

───────────

Appeal From Charleston County
Clifton Newman, Circuit Court Judge

───────────

Opinion No. 6056
Heard October 10, 2023 – Filed April 3, 2024

───────────

**REVERSED AND REMANDED**

───────────

Sarah P. Spruill and Tyler Keith Gilliam, both of Haynsworth Sinkler Boyd, PA, of Greenville; and Stafford John McQuillin, III and Scott Y. Barnes, both of

Haynsworth Sinkler Boyd, PA, of Charleston; all for Appellant.

Capers G. Barr, III, of Barr Unger & McIntosh, LLC, of Charleston; and Jesse Sanchez, of The Law Office of Jesse Sanchez, of Mount Pleasant; both for Respondent.

---

**VERDIN, J.:**  The Boathouse at Breach Inlet, LLC (the Company), by and through its member Laurence D. Stoney, Jr. (Laurence),[1] appeals the circuit court's ruling that Laurence lacked standing to bring this derivative action against Richard S.W. Stoney (Richard), individually and as member-manager of the Company, and Crew Carolina, LLC.  Laurence also argues the circuit court erred in granting a motion to dissociate Laurence as a member of the Company.  We reverse and remand.

## FACTUAL/ PROCEDURAL BACKGROUND

In 1995, Richard, who is a licensed attorney, decided to open a restaurant on the Isle of Palms, which he named The Boathouse on Breach Inlet (the Restaurant). He entered into a twenty-year lease with the option to purchase the property and then proceeded with construction and preparations.  When an investor backed out at the eleventh hour and Richard was running out of money, Richard's brother, Theodore Stoney (Ted), and their first cousin, Laurence, offered to invest in the Restaurant.  On November 21, 1997, Richard, Laurence, and Ted executed the operating agreement to form the Company.[2]  Richard owned eighty percent; Laurence owned five percent; and Ted owned ten percent for himself and an additional five percent in trust for Richard, Jr., Richard's son.[3]  At the time of trial, the Company's members were Richard; Ted; Ted on behalf of Richard, Jr.; Laurence; Richard's now ex-wife, Lori Stoney; Lori on behalf of their daughter Croft Stoney; Gregory Holmes, who bought shares in 2009; and Michael Cox, who bought shares in 2014.  Richard maintained sixty percent of the voting rights.

---

[1] Because this appeal involves several Stoney family members, we refer to them by their first names.

[2] Laurence invested $28,750; Ted invested $50,000 and received a greater percentage of the Company because he had also provided services during the construction of the Restaurant.

[3] The operating agreement listed slightly different ownership interests, but Richard testified the above-listed percentages were correct.

The Restaurant was an immediate success and received national publicity. With the success of the Restaurant, the Company's members opened a second restaurant in downtown Charleston, The Boathouse on East Bay (BEB Restaurant). They formed The Boathouse on East Bay, LLC (BEB) on January 8, 1999, and the BEB Restaurant opened the next month. The BEB members were the same as the Company, with the addition of two new members: Michael Maloney and Beverly Stoney Johnson, Richard and Ted's sister.

Shortly before opening the BEB Restaurant, Richard formed Crew Carolina, LLC (Crew Carolina) to manage the Company and BEB, their corresponding restaurants, and the future restaurants Richard envisioned. Richard, who was Crew Carolina's sole member, held a meeting with the Company's and BEB's members to discuss Crew Carolina's business plan. Richard testified that forming Crew Carolina created savings and increased the buying power in negotiations with vendors by centralizing the restaurants' purchasing, accounting, and operations. Crew Carolina used a sweep account for banking, in which the restaurants' sales were deposited nightly into their individual accounts and then swept into Crew Carolina's central account overnight.

Richard rapidly expanded his restaurant and catering empire under the umbrella of Crew Carolina. However, after BEB, he did not offer Laurence a membership interest in any of the subsequent ventures. Unfortunately, unlike the Company and the Restaurant, none of the subsequent companies enjoyed lasting profitability and success. In order to support these less successful companies and to pay for personal expenses, Richard borrowed money from the Company, which he booked as "due to [the Company]/ due from" Crew Carolina. During his divorce hearing, Richard stated repeatedly that he "'robb[ed] Peter to pay Paul' to keep creditors at bay and allow certain businesses to continue operating." *Stoney v. Stoney*, 425 S.C. 47, 58, 819 S.E.2d 201, 207 (Ct. App. 2018).

Jamie Stabler, Crew Carolina and the Company's current comptroller, bookkeeper, and "crisis manager," acknowledged Richard used funds from the Company to fund his personal expenses and unsuccessful restaurants and entities. She testified Crew Carolina owed the Company over $4 million. She detailed how Richard's day-to-day operation of borrowing money from the Company put the Company into a cash flow crisis, even though the Company consistently produced income. The Internal Revenue Service charged the Company $43,840 in fines and penalties for failing to pay its taxes in a timely manner. Stabler also testified that the Company at times could not make payroll, harming employees who may have been living paycheck to paycheck. She stated Richard used the Company's funds for

non-business travel to the Bahamas, Belgium, Chicago, France, Key West, and New York; payments to his former girlfriend; expenses for his polo ponies; and expenses relating to his share of the family property, Kensington Plantation. She admitted Crew Carolina did not have an income stream or a bank account and she did not believe the Company could collect the outstanding amount it was owed by Crew Carolina. In addition, Stabler testified that Richard had her inquire about writing off the debt to the Company. Eventually, the Company forgave $361,537 in indebtedness on its 2010 tax return.

Richard was advised to stop his practice of taking money from the Company to fund other expenses. On November 26, 2007, Chip Robinson, who was Crew Carolina's comptroller at the time, informed Richard that counsel advised him that any commingling of funds between business entities without identical ownership was not permitted without the members' written permission. In an April 15, 2010 memo, Robinson told Richard they were "consumed with cash flow issues" from two of Richard's other restaurants and suggested removing the Company "in this role as blood donor for the hemorrhages at [the other restaurants to] solve the cash flow issues." Despite these warnings, Richard continued this practice until at least May 2019 and made matters worse.

J. Dennis Jarvis, who was an accountant for the Company, Crew Carolina, and Richard, personally, stated in an affidavit that he was told on numerous occasions that Richard would not repay the millions of dollars he owed to the Company. Because Crew Carolina did not have a cash flow stream or a prospect of generating one, Jarvis and Robinson agreed that Richard should treat the money owed from Crew Carolina to the Company as personal draws to Richard, which must be repaid. In addition, Jarvis stated that Richard proposed closing Crew Carolina and writing off over $4 million that Crew Carolina owed the Company. Finally, Richard instructed Jarvis to refrain from discussing the due to/from book entries with other members of the Company and did not permit him to share the Company's tax returns with certain members, including Laurence. At trial, Jarvis described Richard's use of the Company's funds for personal expenses as "deadly."

Laurence's expert witness, Don M. Hollerbach, a forensic accountant, testified Richard "commingled funds using funds for personal use and effectively turning a commercial enterprise that is a restaurant enterprise into a banking enterprise." Hollerbach summarized his opinions: (1) Richard owed the Company over $4 million; (2) if this amount was a loan, Richard owed $428,107.23 in interest; (3)

there were disproportionate distributions;[4] and (4) the diversion of funds from the Company for personal matters and funding unrelated entities harmed the Company and put it in a cash flow crisis.

Laurence began to suspect Richard was borrowing the Company's funds as early as 1999 because distributions decreased every year even though the Restaurant was doing well. When he asked Richard why he was not receiving distributions, Richard told Laurence to trust him and assured Laurence in an August 9, 2005 letter, "I'm not in the business with my family and dear friends in an attempt to skim profits or benefits not available to them . . . ." Laurence asked Richard to see the Company's books at least ten times, but the only time Richard offered to let him see the books, Richard required him to sign a nondisclosure agreement, which Laurence declined to do. Laurence acknowledged that his relationship with Richard started to deteriorate when the financial issues began.

Laurence also presented evidence of Richard's questionable actions as the Restaurant's property's landlord. Richard had the Company guarantee his personal loan to purchase the property. On November 7, 2012, Richard had the Company confess judgment in favor of the lender in the amount of $1,812,017.69, which he claimed he did to prevent foreclosure of the property.

In May 2011, Richard, as manager and landlord for the Company, entered into a lease that allowed the Company to renew its lease with him in five-year terms through 2035. However, in February 2015, the limited liability company Richard formed to own the land, 101 Palm Boulevard, LLC,[5] entered into a new lease that was only for five years. At trial, Richard testified he was willing to extend the lease to 2035, saying he expected everyone to trust him. The February 2015 lease also changed the responsibility for repairing a bulkhead from the landlord to the Company. Richard explained he did not think it was fair or in his best interest as the landlord to have the responsibility for the bulkhead, which served the Restaurant and not the marina on the property.[6]

---

[4] Hollerbach testified Richard improperly made disproportionate distributions to Holmes and Cox when other members of the Company did not receive distributions. Holmes received a total of $227,503 in distributions between 2012 and 2019; Cox received $7,354 in 2019.
[5] Richard was the sole member of this company.
[6] One quote for the total replacement of the bulkhead was $900,000.

On October 9, 2015, Laurence brought this derivative action on behalf of the Company against Richard and Crew Carolina (collectively, Defendants), asserting various causes of action including breach of fiduciary duty, conversion, unlawful distributions, an accounting, and unjust enrichment. He sought actual and consequential damages; punitive damages; attorney's fees and costs; prejudgment interest; a full accounting, and orders piercing the corporate veil, declaring Defendants were not entitled to indemnification from the Company, and requiring repayment of the money Richard took from the Company.

Defendants answered, asserting a general denial and various defenses, including the statute of limitations, laches, the business judgment rule, doctrines of waiver and estoppel, unclean hands, and asserting that Laurence could not fairly and adequately represent the Company's interests. Ted and Holmes (collectively, Intervenors) moved to intervene, asserting they opposed the derivative action. Laurence subsequently filed an amended complaint asserting Intervenors were not similarly situated members of the Company because they were motivated by their individual interests and benefited from the improprieties in Richard's management. The parties filed a stipulation that Laurence was not similarly situated to any other member of the Company.

After a preliminary hearing on the issue of Laurence's standing to bring this derivative action, the circuit court issued an order allowing Laurence to proceed. Defendants and Intervenors filed a motion to dissociate Laurence, which the circuit court preliminarily denied. After a non-jury trial, the circuit court issued an order holding Laurence was not a fair and adequate representative under Rule 23(b)(1) of the South Carolina Rules of Civil Procedure (SCRCP) to bring this action. It explained his motivations were vindictive and personal, rather than seeking to vindicate a corporate wrong, and the equitable remedy he sought was too tainted by his own inappropriate conduct, especially since ninety percent of the Company's membership opposed the action. In addition, the circuit court granted the motion to dissociate Laurence. Laurence filed a motion to alter or amend, which the circuit court denied. This appeal followed.

**STANDARD OF REVIEW**

"A shareholder's derivative action . . . is one in equity." *Straight v. Goss*, 383 S.C. 180, 191, 678 S.E.2d 443, 449 (Ct. App. 2009). "[A]n action for dissociation is also equitable in nature." *Park Regency, LLC v. R & D Dev. of the Carolinas, LLC*, 402 S.C. 401, 411, 741 S.E.2d 528, 533 (Ct. App. 2012). "Therefore, this court may find facts in accordance with our own view of the preponderance of the

evidence."  *Straight*, 383 S.C. at 192, 678 S.E.2d at 449.  "However, we are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility."  *Id.*

## LAW/ANALYSIS

### I.      Laurence's Standing

Laurence argues the circuit court erred in holding he lacked standing to bring this action because a derivative action was the proper means of seeking redress for alleged wrongs to the Company.  He asserts he was a legitimate "class of one" who would fairly and adequately enforce the rights of the Company.  We agree.

Section 33-44-1101 of the South Carolina Code (2006) authorizes a member of a limited liability company to bring a derivative action.  *See* § 33-44-1101 (authorizing a member to "maintain an action in the right of the company if the members or managers having authority to do so have refused to commence the action or an effort to cause those members or managers to commence the action is not likely to succeed").  Rule 23(b)(1), SCRCP sets out the requirements for "one or more . . . members" of a limited liability company to bring a derivative action to enforce a right of the company.  Thus, under the plain language of the statute and applicable rule, a single member of a limited liability company can bring a derivative action.  *See Maxwell v. Genez*, 356 S.C. 617, 620, 591 S.E.2d 26, 27 (2003) ("In interpreting the meaning of the South Carolina Rules of Civil Procedure, the Court applies the same rules of construction used to interpret statutes."); *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning."); *Maxwell*, 356 S.C. at 620, 591 S.E.2d at 27 ("If a rule's language is plain, unambiguous, and conveys a clear meaning, interpretation is unnecessary and the stated meaning should be enforced.").

In addition, Rule 23(b)(1) limits who may bring such an action, providing "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."  Rule 23(b)(1), SCRCP.  Because our state has not yet addressed whether a single member of a limited liability company may bring a derivative action, we look to other jurisdictions for guidance.

The Sixth Circuit Court of Appeals set forth the following factors for evaluating whether a derivative plaintiff meets the representation requirements outlined in Rule 23.1 of the Federal Rules of Civil Procedure:[7]

> [E]conomic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Davis v. Comed, Inc.*, 619 F.2d 588, 593-94 (6th Cir. 1980).

However, "these factors 'are not exclusive and must be considered in the totality of the circumstances found in each case.'" *Cattano v. Bragg*, 727 S.E.2d 625, 629 (Va. 2012) (quoting *Jennings v. Kay Jennings Family Ltd. P'ship*, 659 S.E.2d 283, 288 (Va. 2008)). The Virginia Supreme Court recognized in applying the *Davis* factors, a single shareholder derivative claim is possible when "the totality of the circumstances support[s] a finding that the plaintiff's personal interests do not preclude the shareholder from fairly and adequately representing the corporation." *Id.*

The Utah Supreme Court similarly held that due to "the greater vulnerability to malfeasance that is present in closely held corporations" a single shareholder could maintain a derivative action as a "class of one" when the shareholder "(1) seeks by its pleading[s] to enforce a right of the corporation and (2) does not appear to be similarly situated to any other shareholder." *Angel Invs. LLC v. Garrity*, 216 P.3d 944, 951 (Utah 2009). As the Texas Supreme Court noted, "The rule[8] does not

---

[7] South Carolina Rule 23(b)(1) uses the language of the prior version of Federal Rule 23.1, which was in effect at the time *Davis* was decided. Rule 23, SCRCP, note. The 2007 amendment to Federal Rule 23.1 was "intended to be stylistic only." Fed. R. Civ. P. 23.1, Advisory Committee Notes.

[8] *See* Texas Rule of Civil Procedure 42(a). This rule was modeled after the Federal Rule of Civil Procedure 23.1. The comments to the current Texas Rule of Civil

place any minimum numerical limits on the number of shareholders who must be 'similarly situated.' It follows that if the plaintiff is the only shareholder 'similarly situated,' he is in compliance with both the letter and the purpose of the rule." *Eye Site, Inc. v. Blackburn*, 796 S.W.2d 160, 162-63 (Tex. 1990).

Numerous other courts have recognized a "class of one" may maintain a derivative action. *See, e.g.*, *Larson v. Dumke*, 900 F.2d 1363, 1368 (9th Cir. 1990) (holding "a single shareholder may bring a derivative suit"); *Jordon v. Bowman Apple Prods. Co.*, 728 F. Supp. 409, 412 (W.D. Va. 1990) ("In appropriate circumstances a single shareholder may be situated in a unique position and thus constitute a legitimate 'class of one.'"); *Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 180 (N.D. Ill. 1987) (holding the plaintiff was a "legitimate class of one" and the defendants did not meet their burden of showing that plaintiff was an inadequate representative); *Brandon v. Brandon Constr. Co.*, 776 S.W.2d 349, 353-54 (Ark. 1989) ("The real test is not the number of shareholders represented in a derivative action, but the alleged injuries and the remedies sought."); *Clemons v. Wallace*, 592 P.2d 14, 16 (Colo. App. 1978) (holding Rule 23.1 of the Colorado Rules of Civil Procedure did not preclude a derivative suit by a corporation with only one minority stockholder); *HER, Inc. v. Parenteau*, 770 N.E.2d 105, 114 (Ohio Ct. App. 2002) (holding that the appellant, who was "the only similarly situated shareholder, can fairly and adequately represent the interests of the corporation.").

We agree with the above cases and hold that under the appropriate circumstances, a single member of a limited liability company may "fairly and adequately represent the interests of" a class of one and have standing to maintain a derivative action. To hold otherwise would be to deprive a sole dissenting shareholder from seeking relief from another shareholder's wrongdoing. *Eye Site, Inc.*, 796 S.W.2d at 163 ("[W]e question the wisdom of construing [the rule] in any manner which prevents a shareholder in a close corporation from enforcing his rights.").

Considering the totality of the circumstances, we hold Laurence qualifies as a legitimate class of one. Reviewing the relevant *Davis* factors, we first address whether lack of support from the other members of the Company bars Laurence from maintaining this action. *See Davis*, 619 F.2d at 594 (listing "the degree of support plaintiff was receiving from the shareholders he purported to represent" as

---

Procedure 42 explain that the portion of the rule regarding derivative suits was deleted because it was redundant to Article 5.14 of the Business Corporation Act, which sets forth detailed procedures for derivative suits.

a factor).  The parties stipulated Laurence was not similarly situated to the other members, and Laurence admitted that no other members officially supported this action.[9]  However, we must consider the other members' motivations for opposing this action in determining whether Laurence is an adequate representative.  *See Larson*, 900 F.2d at 1368 (stating the lack of support from the non-defendant shareholders did not make the sole shareholder an inadequate representative because "the non-defendant shareholders may have been motivated by individual interests, rather than the good of the corporation . . . ."); *Angel Invs. LLC*, 216 P.3d at 951 (holding that "shareholders' motivation for opposing the derivative action is relevant to determining the question of whether any shareholder is similarly situated to the derivative plaintiff").  Ignoring the opposing shareholders' motivations could "permit corporate looting and malfeasance in circumstances where all but one shareholder benefit personally from the illegality or are at risk of personal detriment were the malfeasance brought to light."  *Angel Invs. LLC*, 216 P.3d at 951.

It is evident Richard and the other Company members who opposed this action were motivated by their individual interests.  Richard, the majority member and the one accused of malfeasance and looting the Company, naturally opposed this action.  Ted admitted he opposed the action because he was currently in litigation with Richard to recover over $3 million that Richard owed him.  Although he proclaimed he did not support this action, Ted acknowledged the Company supported Richard's other entities[10] and the return of the $4 million Richard "borrowed" from the Company would benefit it.  Holmes and Cox benefited from Richard's malfeasance by receiving distributions when other members of the Company did not.  While Richard's daughter testified she did not support the litigation, her mother holds her share in trust and supports the action.  Therefore, we hold the other members' lack of support does not preclude Laurence from maintaining this action as a class of one.

We next address whether Laurence's vindictiveness towards Richard motivated him to bring this action.  *See Davis*, 619 F.2d at 594 (listing "plaintiff's vindictiveness toward the defendants" as a factor).  We must keep in mind that "[c]harged emotions and economic antagonism are virtually endemic to disputes in closely held corporations."  *Cattano*, 727 S.E.2d at 629.  We therefore "must look beyond the mere presence of economic and emotional conflict, placing more

---

[9] The circuit court noted Richard's ex-wife Lori supported Laurence's action.

[10] However, he claimed "it was all above-board" because "[e]verything was documented."

emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation." *Id.*

Ted characterized the relationship between Richard and Laurence as being "as bad as you can get" and recalled Laurence threatened to "get Richard" and "turn his world upside down." Although Richard described Laurence as being humble, gracious, and enjoyable to be around at the time they formed the Company, he claimed that by the time they formed BEB, their relationship had deteriorated. The change in their relationship coincided with Richard using the Company's funds to support his other entities and personal expenses, which upset Laurence. In an email dated June 23, 2010, Richard criticized Laurence for being abrasive and threatening litigation, but in the same email, he acknowledged Laurence had not been receiving distributions because profits from the Company were used to support other entities. Ted recalled Laurence "claimed that monies were being diverted from the [Company] to pay for other entities," and he complained about not getting proper distributions from the Company. Laurence acknowledged his concern was the money missing from the Company, but he explained that in bringing this action, he sought to recover the money owed to the Company and use it to make the Restaurant a showpiece.[11] No one disputes Richard owes the Company over $4 million. With this action, Laurence seeks to return this money to the Company. While animosity certainly exists between the parties, we hold this hostility is not fatal to Laurence maintaining the derivative action.

We further hold the remaining *Davis* factors support Laurence's standing to bring this action. *See Davis*, 619 F.2d at 593-94 (listing the factors as "economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; [and] the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself"). Laurence was the driving force of this litigation and was familiar with the proceedings. As far as the record shows, there is no other litigation pending between Laurence and Richard. Laurence has only a five-percent interest in the Company, but he sought to make Richard reimburse the Company over $4 million. As stated above, no one contests that Richard used the Company's funds to support his other entities and personal expenses. Laurence presented evidence that

---

[11] Ted contended Laurence brought the action for personal gain and to get his portion of Kensington, the family plantation.

Richard's use of these funds hurt the Company, at times causing it to be unable to make payroll, incur late fees, and owe money to the IRS. Without a doubt, the return of over $4 million would benefit the Company. In addition, to support his breach of fiduciary duty claim, Laurence presented evidence that Richard used the Company as the guarantor for personal loans and modified the Company's lease to make it more beneficial to Richard as landlord. Laurence prosecuted this action vigorously and declared his intent for the proceeds of the action to be returned to the Company to improve the Restaurant. Therefore, we hold Laurence fairly and adequately represented the interests of the class of one in prosecuting this derivative action for the benefit of the Company. *See Cattano*, 727 S.E.2d at 629 ("[W]e must look beyond the mere presence of economic and emotional conflict, placing more emphasis on whether the totality of the circumstances suggest that the plaintiff will vigorously pursue the suit and that the remedy sought is in the interest of the corporation.").

Furthermore, we doubt Laurence would have had standing to bring an action against Richard individually. Pursuant to Section 33-44-410 of the South Carolina Code (2006), a member of a limited liability company may only maintain an action against the company or another member or manager to enforce that member's rights under the operating agreement and under South Carolina law. That member's loss must be "separate and distinct" from that of the company. *See Ward v. Griffin*, 295 S.C. 219, 221, 367 S.E.2d 703, 704 (Ct. App. 1988) ("A stockholder may individually sue corporate directors, officers, or other persons when he has sustained a loss separate and distinct from that of other stockholders generally." (quoting 19 Am. Jur.2d *Corporations* § 2245 (1986))); *id.* ("However, an individual stockholder has no right to bring an action in his own name and in his own behalf for a wrong committed solely against the corporation." (quoting 19 Am. Jur.2d *Corporations* § 2245)); *Wilson v. Gandis*, 430 S.C. 282, 311-12, 844 S.E.2d 631, 647 (2020) (holding the majority members of a limited liability company lacked standing to bring a breach of fiduciary duty claim in their individual capacities against the minority member because the majority members' loss would not be separate and distinct from the company's loss); *Patterson v. Witter*, 425 S.C. 213, 231, 821 S.E.2d 677, 687 (2018) ("An action seeking to remedy a loss to the corporation is generally a derivative one." (quoting *Brown v. Stewart*, 348 S.C. 33, 49, 557 S.E.2d 676, 684 (Ct. App. 2001))); *id.* ("An action regarding the fiduciary obligation of a director is ordinarily enforceable through a derivative action."); *id.* ("'A shareholder may maintain an individual action only if his loss is separate and distinct from that of the corporation.'" (quoting *Brown*, 348 S.C. at 49, 557 S.E.2d at 684)).

Laurence's claims in this action involved losses to the Company, rather than to his own membership interest, and also involve Richard's alleged breach of his fiduciary duty to the Company; therefore, the claims must be brought in a derivative action.  To deny Laurence standing in the derivative action would deny him and the Company a remedy, which we find is not the intent of Rule 23(b)(1).  *See Eye Site, Inc.*, 796 S.W.2d at 163 ("[W]e question the wisdom of construing [the derivate standing rule] in any manner which prevents a shareholder in a close corporation from enforcing his rights.").  Accordingly, we hold the circuit court erred in finding Laurence lacked standing to bring this derivative action on behalf of the Company.

## II.     Dissociation

Laurence argues the circuit court erred in granting the motion to dissociate him from the Company because Defendants and Intervenors did not meet their burden of showing it was not reasonably practicable to carry on the business with him.  We agree.

"The term 'dissociation' refers to the change in the relationships among the dissociated member [of a limited liability company], the company and the other members caused by a member's ceasing to be associated in the carrying on of the company's business."  *Park Regency, LLC*, 402 S.C. at 411, 741 S.E.2d at 533 (alteration in original) (quoting S.C. Code Ann. § 33-44-601 cmt. (2006)).  A member may be dissociated from a limited liability company by judicial determination when the member "engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the member."  § 33-44-601(6)(iii).

Though not binding on this court, we find the Supreme Court of New Jersey's factors instructive when determining when judicial dissociation is warranted:

> (1) [T]he nature of the [limited liability company] member's conduct relating to the [limited liability company's] business; (2) whether, with the [limited liability company] member remaining a member, the entity may be managed so as to promote the purposes for which it was formed; (3) whether the dispute among the [limited liability company] members precludes them from working with one another to pursue the [limited liability company's] goals; (4) whether there is a

deadlock among the members; (5) whether, despite that deadlock, members can make decisions on the management of the company, pursuant to the operating agreement or in accordance with applicable statutory provisions; (6) whether, due to the [limited liability company's] financial position, there is still a business to operate; and (7) whether continuing the [limited liability company], with the [limited liability company] member remaining a member, is financially feasible.

*IE Test, LLC v. Carroll*, 140 A.3d 1268, 1279 (N.J. 2016). The court cautioned that "[Limited liability company] members seeking to expel a fellow member . . . are required to clear a high bar" and a court may not order disassociation "merely because there is a conflict." *Id.* It explained "disagreements and disputes among [limited liability company] members that bear no nexus to the [limited liability company's] business" did not justify a member's expulsion, and "it must be unfeasible, despite reasonable efforts, to keep the [limited liability company] operating while the disputed member remains affiliated with it." *Id.* at 1278.

In finding Laurence should be dissociated, the circuit court cited (1) Laurence's denigrating the Company to its food vendors; (2) his efforts to change the ownership and management of the Company during Richard's divorce litigation; and (3) his efforts to purchase the BEB land without disclosing his efforts to Richard. We find none of these incidents evidence conduct relating to the Company's business that would warrant judicial dissociation.

Richard and Ted claimed Laurence talked negatively about Richard to the representatives of Richard's major food suppliers at the Carolina Yacht Club, telling them that Richard was not paying his bills, that the restaurants were on a cash basis, and that Richard would not do business with Laurence. In contrast, Laurence stated the "word on the street" with the vendors was that Richard and the Company had bad credit. He maintained he did not tell the vendors that the Company had credit issues; rather, they told him. Both Richard and Laurence acknowledged having a confrontation about Laurence's statements, but while Richard testified that Laurence did not deny making the statements, Laurence asserted he told Richard the vendors were the ones talking about his bad credit.

First, in taking our own view of the preponderance of the evidence, we find Laurence was truthful in testifying the vendors came to him about the credit issues. Richard was, in fact, having credit issues at this time. Furthermore, Richard did

not present any of the vendors at trial to contradict Laurence's assertions. Finally, we find Laurence's negativity was directed at Richard and not at the Company. *See* S.C. Code Ann. § 33-44-201 (2006) (stating a limited liability company is a legal entity distinct from its members).

Next, we hold Laurence's testimony at Richard's divorce hearing did not support judicial dissociation. At the 2011 divorce hearing, Laurence testified that he was not averse to the family court awarding Lori the Company and he agreed with her hiring a manager, such as Bill Hall of Hall's Chophouse, to manage the Restaurant. We find Laurence's planning for the possibility of Lori receiving Richard's membership interest in the Company did not warrant dissociation and any negativity was directed at Richard, individually, and not at the Company. *See* § 33-44-201 (stating a limited liability company is a legal entity distinct from its members).

Finally, we find Laurence's attempt to purchase the property that BEB leased for BEB Restaurant did not warrant dissociation. When BEB Restaurant opened, BEB leased the property from the Drew family. The relationship with the Drew family quickly soured, and Richard and Ted entered into negotiations to purchase the property. Laurence also made an offer to purchase the property. He admitted he did not tell Richard and Ted he also wanted to purchase the property and explained he thought the property would be a good investment for him individually. Although Richard and Ted ultimately prevailed in purchasing the property, they paid $100,000 to $200,000 more than they originally planned.

We hold Laurence's attempt to purchase the property did not have a sufficient nexus to the Company's business to warrant dissociation. *See IE Test*, 140 A.3d at 1278 (holding "disagreements and disputes among LLC members that [bore] no nexus to the LLC's business [would not] justify a member's expulsion"). First, BEB was a separate limited liability company from the Company. Second, Richard and Ted bought the property for themselves and not on behalf of BEB or the Company. Accordingly, Laurence did not usurp a corporate opportunity, and he had an equal right to seek purchase of the property as they did. *See* S.C. Code Ann. § 33-44-409(e) (2006) ("A member of a member-managed company does not violate a duty or obligation under this chapter or under the operating agreement merely because the member's conduct furthers the member's own interest."); § 33-44-201 (stating a limited liability company is a legal entity distinct from its members).

In addition, while the parties expressed their opposition to being in business together, we find their animosity was not sufficient for judicial dissociation. Much of their disagreement was over Richard's use of the Company's funds and may be resolved with this action. In addition, with only a five-percent interest, Laurence was not in a position to interfere with the management of the Company or create deadlock. Furthermore, the Restaurant was doing well financially, and Richard testified he expected it to increase sales by $250,000 to $500,000 that year. Therefore, the Company was in a financial position to continue operating, and Laurence remaining a member would not make the continuation of the Company financially unfeasible.

We, therefore, hold the circuit court erred in finding Laurence "engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the member." *See* § 33-44-601(6)(iii). Accordingly, we reverse the circuit court's grant of the motion for dissociation.

**CONCLUSION**

We **REVERSE** the circuit court's finding that Laurence was not an appropriate member representative for this derivative action and its dismissal of this action. We further **REVERSE** the circuit court's granting of the motion to dissociate Laurence. We **REMAND** this matter for a determination of the merits of the derivative action.

Accordingly, the order of the circuit court is

**REVERSED AND REMANDED.**

**WILLIAMS, C.J., and HEWITT, J., concur.**