727 S.E.2d 773

**Jeffrey S. CLARY & TUG Properties, LLC, Plaintiffs,**

**Of whom Jeffrey S. Clary is Appellant,**

**v.**

**Clifton David BORRELL, Respondent.**

**No. 4991.**

Court of Appeals of South Carolina.

Heard Feb. 14, 2012.

Decided June 13, 2012.

288

Kenneth C. Hanson and Walter M. Riggs, Hanson Law Firm, of Columbia, for Appellant.

Page M. Kalish, of Columbia, for Respondent.

HUFF, J.

Jeffrey S. Clary and TUG Properties, LLC (TUG) instituted this action against Clifton David Borrell for breach of contract and quantum meruit, wherein Clary and TUG asserted Borrell breached the TUG operating agreement entered into by Clary and Borrell. From an order of the trial court granting Borrell summary judgment on both claims, Clary appeals the grant of summary judgment on the breach of contract cause of action. Specifically, Clary contends the court erred in (1) finding there was no genuine issue of material fact in controversy, as Clary provided evidence Borrell signed a statement promising to pay TUG's debts and personally guaranteed TUG loans and (2) determining Borrell's personal guarantee for TUG's loans did not constitute additional capital contributions. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

On February 2, 2004, Clary and Borrell entered into an operating agreement to form a limited liability company, TUG, with Clary and Borrell each initially contributing around $70,000 for a fifty percent ownership in TUG.[1] Clary and Borrell agree that the operating agreement controls the rights and obligations of Clary and Borrell as the members of TUG, and is a valid contract between the two. The operating agreement provided the stated purpose of the company was to buy and sell residential real estate. Article IV of the operating agreement includes the following pertinent provisions:

### 4.1 Initial contributions.

---

1. Clary's affidavit states each party initially invested $70,000, while Borrell maintains in his brief that he made an initial contribution of $71,000, pointing to a general journal account ledger from TUG indicating a balance forward of $71,000 in Borrell's capital account as of September 30, 2004.

Each initial member shall make the Capital Contribution described for that Member on Exhibit A at the time and on the terms specified on Exhibit A and shall make such additional capital contributions as may be required of Members from time to time. . . .

**4.2 Subsequent contributions.**

Without creating any rights in favor of any third parties, each member shall contribute to the Company, in cash, on or before the date specified as hereinafter described that Member's pro rata share of all monies that in the judgment of a Required Interest, is necessary to enable the Company to cause the assets of the Company to be properly operated and maintained and to discharge its costs, expenses, obligations, and liabilities. A Required Interest shall determine and notify each Member of the need for Capital Contributions pursuant to this Section 4.2 when appropriate, which notice must include a statement in reasonable detail of the proposed uses of the Capital Contributions and a date . . . before which the Capital Contributions must be made.

**4.3 Failure to contribute.**

**A.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided by this Operating Agreement, the Company may exercise, on notice to that Member (the "Delinquent Member"), one or more of the following remedies:

(2) permitting the other Members on a pro rata basis or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Delinquent Members Capital Contribution that is in default, with the following results:

(a) the sum advanced constitutes a loan from the Lending Member to the Delinquent Member and a Capital Contribution of that sum to the Company by the Delinquent Member pursuant to the applicable provisions of this operating agreement.

**4.5 Advanced by Members.**

If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so may advance all or part of the needed funds to or on behalf of

the Company. An advance described in this section constitutes a loan from the Member to the Company, . . . and is not a Capital Contribution.

Article I of the operating agreement includes the following pertinent definitions:

**"Capital Contribution"** means any contribution by a Member to the capital of the Company.

**"Company"** means TUG PROPERTIES, LLC, a South Carolina Limited Liability Company.

**"Delinquent Member"** means a Member who does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Operating Agreement.

**"Lending Member"** means those Members, whether one or more, who advance the portion of the Delinquent Member's Capital Contribution that is in default.

**"Required Interest"** means One Hundred Percent (100%) percent (sic) of all Members.

Article V, dealing with allocations and distributions, includes a provision as follows:

**5.1 Allocations of net profits and losses from operations.**

Except as may be required by § 704(c) of the Code, and Sections 5.2, 5.3, and 5.4 of this Article V, Net Profits, Net Losses, items of loss of deduction and tax credit and items of income and gain shall be apportioned among the Members as follows:

| | |
|---|---|
| Clifton David Borrell | 50% |
| Jeffrey S. Clary | 50% |

Additionally, the operating agreement provides under Section 3.7 of Article III that, in regard to liability to third parties, "Except as otherwise expressly agreed in writing, no Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court."

By agreement of the parties, Clary managed the day-to-day operations of TUG, while Borrell had no control over such matters and acted more as a "silent partner." According to Clary, in early 2006, he and Borrell mutually agreed to

suspend operations due to the unprofitable nature and lack of capital to continue operations.

In December 2008, Clary and TUG filed this action against Borrell for breach of contract and quantum meruit, citing Article IV, Section 5.1 of the operating agreement, and alleging that Borrell and Clary contributed equally to TUG for a time, but Borrell thereafter refused to provide a fifty percent contribution as required by the operating agreement, causing Clary to expend his own financial resources in a greater percentage to make up for Borrell's shortfall in contributions. Clary further alleged that TUG had certain outstanding obligations, that Clary and Borrell were to share equally in the profits and losses of TUG under the agreement, and though Clary made demands of Borrell to pay his equitable share of expenses and losses, Borrell refused. In addition to the net sum difference between the amount Clary had contributed and the amount Borrell had contributed, as well as a fifty percent contribution for the current obligations of TUG, Clary and TUG sought punitive damages from Borrell as a deterrence of similar conduct in the future. Borrell answered, generally denying the allegations of the complaint and raising various counterclaims.

Thereafter, Borrell filed a motion for summary judgment, basing his motion on the ground that Article V of the operating agreement, relied upon by Clary and TUG, only determined how gains and losses would be apportioned between the members for tax purposes and did not require Borrell to maintain 50% contributions to TUG to match that made by Borrell. Additionally, Borrell maintained he complied with Article IV, Section 4.1 of the operating agreement by making the required initial contribution to TUG and that any subsequent contributions to TUG were governed by Article IV, Section 4.2, which would have required Borrell's vote and agreement as a prerequisite to mandatory contributions of the members, which never occurred. Thus, any additional contributions Clary made to TUG would be loans to and liabilities of TUG and would be owed by TUG, not Borrell, to Clary. Further, Borrell noted Section 3.7 of the operating agreement provided that no member was liable for the debts, obligations, or liabilities of TUG, so the obligations of TUG remained with TUG, and were not obligations of the individual members.

Borrell therefore maintained he was entitled to summary judgment, as Clary and TUG could present no evidence that he breached the operating agreement. Borrell also argued TUG was not a proper party to litigate this matter against Borrell, because Borrell and Clary are each fifty percent owners, and a vote from them regarding TUG's litigation against Borrell would be deadlocked. Borrell also asserted the action for quantum meruit was not proper, as the parties agreed they were governed by the operating agreement, and quantum meruit is an equitable remedy available only when there is no contract. Lastly, Borrell contended the demand for punitive damages should be struck, because punitive damages are not available in a breach of contract cause of action, or in the alternative under contract theory of quantum meruit. Borrell supported his motion with his affidavit, wherein he stated he complied with Article IV, Section 4.1 of the operating agreement by making his initial required capital contribution, and he "never voted, authorized, consented or agreed to subsequent contributions, which is required by the express terms of Article IV, Section 4.2" of the operating agreement, nor did he waive his right to such.

In response, Clary asserted that, after he and Borrell determined they needed to close down the business, Borrell agreed to make a "final subsequent contribution to zero out the company." However, when Clary and the accountants attempted to send Borrell records to show the need for subsequent capital contributions to make this happen, Borrell did not want to pay anymore. Clary maintained that both he and Borrell had made subsequent contributions to TUG after their initial capital contributions, but once the decision was made to close the business, Borrell failed to make any subsequent contributions. Contrary to Borrell's assertion, Clary argued he could show Borrell did in fact make contributions to TUG beyond his initial contribution during the course of the business, and submitted his affidavit, averring the same. Clary maintained that in May 2005, Borrell contributed $10,000 for the purchase of certain property on Ramsgate Drive in Augusta, Georgia. He further asserted Borrell loaned his creditworthiness on behalf of TUG to several loans for purchases of property, ostensibly presenting copies of notes referencing Borrell's personal guarantee of loans for the

Ramsgate Drive property, as well as for Calvary Drive and Wrightsboro Drive in Augusta, Georgia. Additionally, Clary submitted a handwritten statement, allegedly signed by Borrell on September 22, 2006, which Clary asserted constituted Borrell's "vote or blanket acquiescence in and for payment of debts so as to comply with Section 4.2 of Article IV" of the operating agreement. Clary noted that Section 4.3 of the operating agreement provided that if a member did not contribute his capital contribution within the required time, and another member advanced the delinquent member's portion, the sum advanced constituted a loan from the lending member to the delinquent member. Clary reasoned, because he averred in his affidavit that Borrell was given notice of all meetings but failed to attend the same, Borrell's September 22 handwritten statement gave Clary authority to wind-down the affairs of TUG and amounted to Borrell's promise to pay Clary for his share of monies advanced by Clary toward the winding down cost.

Borrell countered that Clary and TUG produced nothing through discovery that would indicate Borrell voted to approve subsequent capital contributions, waived his right to do the same, or actually made subsequent capital contributions. Borrell argued the only specific subsequent capital contribution Clary alleged was that Borrell contributed $10,000 for the purchase of the Ramsgate property, but the only documentation Clary submitted to support this claim did not show Borrell contributed this money as a capital contribution, and the document attached by Clary showed, to the contrary, that it was classified as a loan. As to the documents submitted by Clary concerning Borrell acting as a personal guarantor of loans, Borrell argued a personal guaranty does not qualify as capital contributed to TUG, as it added no value to TUG and there was no accounting for the personal guarantee in the TUG capital account for Borrell. Additionally, any personal guaranty would be a liability of Borrell, not TUG, and therefore could not constitute capital contributions as defined by the operating agreement. Finally, in regard to the handwritten document relied upon by Clary, which appeared to be signed by Borrell and stated, "Jeff, when the accounts are settled if I owe you I will pay you," Borrell maintained no reasonable interpretation of the document indicated Borrell

would pay any debts of TUG, and any money Clary paid to settle the debts of TUG would constitute a loan, as there was no vote or agreement by Borrell to make a subsequent capital contribution to TUG. Borrell additionally noted that the purported handwritten statement from him included a condition precedent, such that performance was expressly conditioned upon him owing money to Clary. In summary, Borrell maintained Clary produced no evidence to disavow Borrell's position that no consensus was ever reached regarding additional capital contributions as required by Section 4.2 of Article IV of the operating agreement, and any money allegedly advanced by Clary to TUG was nothing more than a loan to TUG by Clary.

The trial court issued an order granting Borrell's motion for summary judgment. The court found Clary and TUG (1) provided no evidence any decision was made by one hundred percent of the members regarding the need for additional capital as required by Article IV, Section 4.2 of the operating agreement, (2) provided no evidence to refute the language of Article IV, Section 4.5 of the operating agreement that would entitle a member who advanced funds to recover those funds as a loan, (3) provided no evidence to refute language in the operating agreement that members are not entitled to recover capital contributions, and (4) provided no evidence that Borrell's personal guaranties for properties purchased by TUG constituted subsequent capital contributions. The trial court, therefore, determined that Borrell was entitled to summary judgment on this issue. Additionally, the trial court found Borrell was entitled to summary judgment as a matter of law on the punitive damages claim, that quantum meruit was not available to Clary and TUG, and there was no evidence TUG was a proper plaintiff, as there was no legal basis for joining the company. The trial court, therefore, found there were no genuine issues of material fact, that Clary and TUG raised no issues to contravene the language of the TUG operating agreement, and Borrell was entitled to summary judgment. Clary, alone, now appeals the trial court's grant of summary judgment to Borrell on Clary's breach of contract action.

## ISSUES

1. Whether the trial court erred in finding there was no genuine issue of material fact in this controversy where evi-

dence was presented that Borrell signed a statement promising to pay TUG's debts and had personally guaranteed TUG's loans.

2.  Whether the trial court erred in determining Borrell's personal guarantee for TUG's loans did not constitute additional capital contributions.

**STANDARD OF REVIEW**

"The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder." *Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003) (quoting *George v. Fabri,* 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001)).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), SCRCP.  "A court considering summary judgment neither makes factual determinations nor considers the merits of competing testimony; however, summary judgment is completely appropriate when a properly supported motion sets forth facts that remain undisputed or are contested in a deficient manner." *David v. McLeod Reg'l Med. Ctr.,* 367 S.C. 242, 250, 626 S.E.2d 1, 5 (2006).

**LAW/ANALYSIS**

█  Clary contends the trial court erred in finding there was no genuine issue of material fact where evidence was presented that Borrell signed a statement promising to pay TUG's debts and Borrell had personally guaranteed TUG's loans.  He argues the September 22, 2006 handwritten note by Borrell was a promise to pay his share of the debts, which constituted his vote for additional capital contributions so as to comply with Article IV, Section 4.2 of the operating agreement.  In the alternative, Clary contends this statement "is a blanket acquiescence in and for payment of the debts," and is Borrell's promise to pay, which is a contract in and of itself that has been breached.  Clary additionally asserts he showed Borrell contributed more than the initial capital contribution to TUG through his affidavit, wherein he stated additional capital was contributed by both parties and debt was secured in the name of both parties to purchase properties and fund

TUG's operations along with documents he presented showing Borrell personally guaranteed loans on behalf of TUG, obtained personal loans, and assumed a debt of TUG. Finally, Clary contends because limited discovery occurred at the time Borrell sought summary judgment, and Clary's present counsel had only been involved in the matter for several days, his counsel did not have an opportunity to undertake adequate discovery to "ferret out further information necessary" to properly represent his client.

The operating agreement of a limited liability company is a binding contract that governs the relations among the members, managers, and the company. *See* S.C.Code Ann. § 33–44–103(a) (2006) (stipulating, except as otherwise provided, "all members of a limited liability company may enter into an operating agreement ... to regulate the affairs of the company and the conduct of its business, and to govern relations among the members, managers, and company"). Generally, operating agreements are superior to statutory authority where they are in place and address a matter, inasmuch as it is only when an operating agreement is silent as to some matter that statutory law will apply. *See id.* ("To the extent the operating agreement does not otherwise provide, this chapter governs relations among the members, managers, and company.")

Article IV, Section 4.2 of the TUG operating agreement, concerning subsequent contributions beyond the required initial contributions, expressly provides that each member shall contribute to TUG, in cash, on or before a specified date that member's pro rata share of all monies that in the judgment of a "Required Interest," is necessary for the proper operation and maintenance of TUG, and for discharge of costs, expenses, obligations, and liabilities of TUG. This section further mandates that a "Required Interest" determine and notify each member of the need for a capital contribution, and that the notice given include a statement in reasonable detail of the proposed uses of the capital contributions and a date before which the Capital Contributions must be made. The operating agreement further defines "Required Interest" as one hundred percent of all members. Thus, in order for Borrell to be required to make a subsequent contribution pursuant to the operating agreement, he, along with Clary, as one hundred

percent of the members of TUG, must have made a determination that a cash contribution was necessary, and Borrell, as a member, must have been notified of the need for the subsequent capital contribution, with such notice including "a statement in reasonable detail of the proposed uses of the Capital Contributions and a date ... before which the Capital Contributions must be made."

We find no merit to Clary's argument that the September 22, 2006 handwritten statement by Borrell constituted his vote for additional capital contributions so as to comply with Article IV, Section 4.2 of the operating agreement. This note, purportedly signed by Borrell, is addressed to "Jeff" and states, "When the accounts are settled if I owe you money I will pay you." This handwritten note fails to comply with the requirements of section 4.2 of the operating agreement, as (1) there is no indication that Borrell and Clary agreed that it was necessary to make a subsequent capital contribution, (2) there is nothing to show that Borrell was notified of the need for a subsequent capital contribution or the date by which it must be made, and (3) there is no statement whatsoever detailing the proposed uses of any necessary capital contribution. As to Clary's alternative assertion that this note constitutes "a blanket acquiescence in and for payment of the debts," thereby qualifying as a contract in and of itself that has been breached, this argument was never raised to nor ruled on by the trial court and therefore is not preserved for review. *See Pikaart v. A & A Taxi, Inc.*, 393 S.C. 312, 324, 713 S.E.2d 267, 273 (2011) ("A matter may not be presented for the first time on appeal; rather, it must have been both raised to and ruled upon by the court below."); *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review.").

◼ We likewise assign no importance to Clary's contention that his affidavit, along with certain documents he presented, showed Borrell personally guaranteed loans on behalf of TUG, obtained personal loans, and assumed a debt of TUG, thereby showing Borrell contributed more than the initial capital contribution to TUG, as we find they have no effect on this matter. Even if we were to assume the documents submitted

by Clary in this regard were sufficient to enable the court to determine they represent the claimed actions by Borrell, such would not qualify as mandatory subsequent capital contributions pursuant to section 4.2 of the operating agreement. First, there is no evidence to suggest that any loans obtained or assumptions of debt by Borrell on behalf of TUG met the specifications of section 4.2 regarding the necessary determination by one hundred percent of the members, notice, and a detailed statement of proposed use. More importantly, however, we fail to discern how previous contributions by Borrell have any effect on Clary's allegation that Borrell failed to make subsequent capital contributions in compliance with Article IV, Section 4.2 of the operating agreement. As noted, summary judgment is appropriate where there is no genuine issue of material fact. Clary's entire case rests upon his assertion that Borrell failed to make equal contributions to TUG as Clary made and failed to make additional contributions to cover TUG's debts, thereby breaching the operating agreement. Thus, it is only those contributions beyond what Borrell has already made that Clary seeks from Borrell. Further, whether Borrell may have made some voluntary contributions to TUG beyond what was required pursuant to the operating agreement is of no concern in determining whether Borrell was thereafter required to make subsequent capital contributions pursuant to section 4.2 of Article IV.[2] *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App. 1987) (noting our appellate courts recognize an overriding rule which says: "whatever doesn't make any difference, doesn't matter"). Here, there is simply no evidence whatsoever that (1) Borrell and Clary ever agreed it was necessary to require the members to make a subsequent capital contribution, (2) that Borrell, as a member, was ever notified of the necessity of a subsequent capital contribution, or (3) that any statement detailing the proposed use of a subsequent capital contribution and the date before which such contribution should be made was ever provided to Borrell as a member, so as to meet the

---

2. Indeed, Article IV, Section 4.5 of the operating agreement expressly provides that a member may advance funds on behalf of TUG when TUG does not have sufficient funds to pay its obligations, and such advance would then constitute a loan from the member to TUG, and "not a Capital Contribution."

requirements of section 4.2 such that Borrell could be held responsible for subsequent capital contributions.

As to Clary's contention that his attorney did not have an opportunity to undertake adequate discovery, this argument is not preserved for our review. *Pikaart*, 393 S.C. at 324, 713 S.E.2d at 273 (noting a matter must have been both raised to and ruled upon by the trial court to be preserved for appellate review).[3]

Clary next contends the trial court erred in determining that Borrell's personal guarantee for TUG's loans did not constitute additional capital contributions. He argues Borrell was "clearly providing additional capital to [TUG] by taking on an obligation or promissory note for the organization" and providing such a service qualifies as a capital contribution pursuant to S.C.Code Ann. § 33–42–810. As noted above, we fail to see how evidence of any past voluntary contributions by Borrell are of any importance in determining this matter. Even assuming arguendo that Borrell's personal guarantees on behalf of TUG could qualify as "capital contributions," Clary has failed to present any evidence that the contributions for which he seeks reimbursement were required pursuant to the terms of the operating agreement, i.e. section 4.2. Because our analysis under the first issue is dispositive, we need not address this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

For the foregoing reasons, the order granting Borrell summary judgment is

**AFFIRMED.**

SHORT, J., concurs.

---

3. Counsel for Clary noted at the outset of the hearing that he had filed a motion for continuance "to get up to speed," but stated he did not "think the facts [were] going to change from today until a later date," and did not object to the trial court going forward with the hearing. The trial court specifically recognized Clary's attorney had only been hired in the week before the summary judgment hearing, and allowed counsel additional time to review documents and supplement the record with written memorandum. Clary's counsel interposed no objection to this.

FEW, C.J., concurring.

I concur in the result reached by the majority. However, I would resolve this appeal summarily under Rule 220(b)(1), SCACR. *See In re Memorandum Decisions by Court of Appeals*, 322 S.C. 53, 55, 471 S.E.2d 456, 457 (1993) (finding this court may resolve appeals using memorandum opinions that give the court's reasons for deciding each issue raised on appeal). The first issue on appeal is whether the handwritten September 22, 2006 note signed by Borrell obligated him to make additional capital contributions. There is no evidence in the record to support a conclusion that it did, and no further analysis is required. First, the note is written to "Jeff," not to the LLC. Second, the note does not mention the LLC or any obligation to the LLC. Finally, there is no evidence in the record the LLC voted as provided in its operating agreement to require any capital contribution from its members after the initial contribution. As the majority points out, we need not address the second issue on appeal.