741 S.E.2d 528

**PARK REGENCY, LLC, Landy Properties, LLC, and Sowers Properties, LLC, individually and in a derivative capacity on behalf of Crossroads Retail, LLC, Appellants,**

v.

**R & D DEVELOPMENT OF THE CAROLINAS, LLC, Hawkensen Construction, Inc., and Carl's Construction, Inc., Respondents.**

Appellate Case No. 2011–187167.

No. 5056.

Court of Appeals of South Carolina.

Heard Oct. 3, 2012.

Decided Nov. 28, 2012.

402

Walter Keith Martens, of Hamilton, Martens & Ballou, LLC, of Rock Hill, for Appellants.

Thomas B. Roper, of Rock Hill, and James B. Richardson, Jr., of Columbia, for Respondents.

CURETON, A.J.

In this suit arising from a dispute among members of a limited liability company (LLC), the trial court dissociated R & D Development of the Carolinas, LLC (R & D) from the company and ordered the remaining members of the company to purchase R & D's distributional interest. Appellants contend the trial court erred in (1) not considering the company's legal obligation to repay debts to its remaining members and other relevant and undisputed evidence when valuing R & D's distributional interest and (2) treating R & D's liability to the other members as an offset to the fair value of its distributional interest instead of entering a judgment against the dissociated member. We affirm as modified.

## FACTS

Crossroads Retail, LLC (Crossroads) was formed for the purpose of developing a tract of land in Fort Mill (the Property), which initially consisted of 29.84 acres. After the relationships between members of Crossroads broke down, Park Regency, LLC (Park Regency); Landy Properties, LLC (Landy Properties); and Sowers Properties, LLC (Sowers Properties) (collectively, Appellants) filed this action to dissociate R & D from Crossroads. Appellants joined Hawkensen Construction, Inc. (Hawkensen) and Carl's Construction, Inc. (Carl's) as defendants.

Hawkensen, R & D, and Carl's (collectively, Respondents) were owned, at least in part, by Carl Hawkensen.[1] Hawkensen was an incorporated construction company. R & D was an LLC, in which Carl Hawkensen owned an 85% interest and Chad Whitmire owned the remaining 15%. Originally incorporated in 1990, Carl's was administratively dissolved in 1997. However, after the dissolution, Carl Hawkensen continued to operate Carl's as a sole proprietorship.

## I. Acquisition of the Property

In 2006, Hawkensen deposited $75,000 in earnest money on a contract to purchase the Property for $2,957,600. After Hawkensen failed to secure adequate funding, the seller enlisted the assistance of Eric Sowers, a mortgage broker. Sowers referred Carl Hawkensen to Roger Gaines of Park Regency, a company that had recently sold some investment property and was seeking new investment property for a section 1031 exchange.[2] On July 25, 2006, the three reduced a preliminary acquisition and development agreement to writing. Later, Gaines introduced Carl Hawkensen to Steven Landy of Landy Properties, another investor. Ultimately, Park Regency agreed to provide as much as $800,000 toward the purchase of the Property, and Landy Properties provided $201,100 in

---

1. In an effort to differentiate the individual from the companies that bear his name, we refer to Carl Hawkensen by his first and last names.

2. Section 1031 of the Internal Revenue Code permits a taxpayer to exchange, within a prescribed period of time, property held for investment for other property of like kind without recognizing any gain or loss in value for tax purposes. 26 U.S.C.A. § 1031(a)(1) (2011).

additional funds. Park Regency took out a loan in the amount of $1,922,440 to cover the remainder of the purchase price.

On September 27, 2006, Park Regency, Hawkensen, R & D, Sowers, and Landy executed a written contract (the Crossroads Commons Agreement) memorializing their intent to purchase and develop the Property. The Crossroads Commons Agreement established a sequence of events affecting the obligations and ownership interests of the parties. Park Regency agreed to accept title to the Property pending R & D's completion of its obligations and to transfer title as described below. Hawkensen and R & D agreed to assign Hawkensen's rights under the purchase contract to Park Regency, establish an account "insuring Hawkensen['s] . . . performance," pay the interest and carrying charges on loans used to develop the Property, and maintain at least $80,000 in an escrow account for that purpose. Furthermore, R & D agreed it would "[i]mmediately commence and complete at cost the first phase of clearing and grading of the Property in a good and workmanlike manner" in compliance with a previously established budget.[3] Hawkensen agreed to ensure R & D complied with its obligations.

All parties agreed that, upon R & D's fulfillment of its obligations, the remaining members of the group would receive their ownership interests in the Property: R & D would receive a 47.5% interest, Sowers would receive a 5% interest for providing "professional services," and Landy Properties would receive a 10% interest for supplying funds for the purchase of the Property. On October 6, 2006, Park Regency acquired title to the Property.

## II. Formation of Crossroads

### A. Agreement among Tenants in Common

On November 9, 2007, Park Regency, R & D, Landy Properties, and Sowers Properties (collectively, the Tenants) executed an Agreement among Tenants in Common (the TIC Agreement). The TIC Agreement recognized that the Ten-

---

3. Although referenced as "Exhibit B" in the Crossroads Commons Agreement, this budget does not appear in the record and appears to have been misplaced prior to litigation. However, a budget introduced without objection at trial indicates the budgeted amount was $596,700.

ants already owned the Property in the proportions identified in the Crossroads Commons Agreement: Park Regency owned 37.5%, R & D owned 47.5%, Landy Properties owned 10%, and Sowers Properties owned 5%. The TIC Agreement states the Tenants, as owners of the Property:

> [D]esire by this Agreement to set forth and confirm their mutual agreements and understandings with respect to their ownership interests in the Property, their respective rights and obligations as tenants in common of the Property, and their right to manage, rent, operate, maintain, alter, improve, lease, transfer, sell or otherwise control the disposition of the property or any part thereof.

The TIC Agreement acknowledged mutual ownership of the Property and established each Tenant's rights and obligations, including requirements concerning a Tenant's withdrawal from the group.

Following the appointment of a property manager, the Tenants anticipated quarterly disbursements of any monies received that exceeded the Property's operating costs. They established an order for these disbursements. First, Park Regency and then Landy Properties would receive payments up to the amounts they had invested. Next, Hawkensen, in its capacity as Horizontal Developer, would receive payments for "its unpaid hard costs including costs prior to closing such as initial contract deposit, engineering, surveying, etc." Finally, the Tenants would receive payments corresponding to their proportionate shares.

In the event revenues from the Property and the Tenants' reserves were insufficient to pay taxes, loan payments, or other operating costs, the Tenants agreed to contribute the necessary funds in accordance with their proportionate shares. Although any Tenant's failure to contribute would be an event of default, two provisions specifically addressed R & D's participation. First, in the event of R & D's uncured default for failure to contribute, the other Tenants could purchase R & D's interest in the Property for 75% of its fair market value, "reduced further by any payment outstanding by R & D." Second, R & D agreed to maintain $250,000 in an escrow account for the purpose of paying "all interest and other carrying charges" on the loan or loans encumbering the

Property. R & D's failure to do so would be an event of default.

Paragraph 11 of the TIC Agreement addressed transfers of Tenants' interests, with subsection (c) outlining events of default. In the event of a Tenant's default, the remaining Tenants would have the option (1) to cure using funds from the defaulting Tenant's distributions or (2) to purchase the defaulting Tenant's interest in the Property. Paragraph 11(c)(ii) described the method for determining the purchase price of a defaulting Tenant's interest. After an independent appraiser determined the fair market value of the Property, the parties would determine the value of the dissociating Tenant's distributional interest by calculating the difference between (1) the fair market value of the Property, multiplied by the defaulting Tenant's proportionate share; and (2) all outstanding financial obligations as of the date of closing, multiplied by the defaulting Tenant's proportionate share. Paragraph 10(a) defined the specific obligations as taxes and "maintenance expenses required by [Hawkensen] or any property manager and approved by [a 51% majority vote of the Tenants]." The remaining Tenants would then pay the dissociating Tenant 75% of the value of its distributional interest, less any amounts the dissociating Tenant owed.

The Tenants agreed any closing resulting from an event of default and conducted pursuant to the TIC Agreement would take place "within two hundred seventy (270) days from the date of notice of the Event of Default." However, they could extend the closing date "by any period necessary to determine the purchase price" of the defaulting Tenant's interest. Payment to the defaulting Tenant would be "in cash at closing."

## B. Transfers of Ownership

One week after executing the TIC Agreement, Park Regency conveyed the Property via quit-claim deed to the Tenants, as contemplated in the Crossroads Commons Agreement.[4] In May 2008, the Tenants sold approximately fifteen acres of the

---

4. Accordingly, Park Regency received an ownership interest of 37.5%, R & D received 47.5%, Landy Properties received 10%, and Sowers Properties received 5%.

Property to a third party for $750,000.[5] The Tenants used the proceeds from that sale to pay down the loan on the Property. In addition, they formed Crossroads, with each Tenant receiving a share of ownership in the LLC equal to its proportionate share of the Property under the TIC Agreement. They did not execute an operating agreement. On May 30, 2008, the Tenants executed a quit-claim deed conveying their remaining interest in the Property to Crossroads. In doing so, the Tenants retained the same percentages of ownership in Crossroads, and therefore in the unsold portion of the Property, that they had held in the Property itself.

## III. Financial Disputes

Hawkensen established a budget of $596,700 to complete the initial work on the Property. Having completed most of this work between June and November 2007, Hawkensen submitted payment applications for its work in September 2007, December 2007, and May 2008. The Tenants approved these payment applications, which totaled $581,199.02. The Tenants paid Hawkensen $424,481.32 directly, made interest payments totaling $76,717.70 on Hawkensen's behalf, and deposited $80,000 into an escrow account on Hawkensen's behalf.[6]

On November 30, 2007, Whitmire, on behalf of R & D, sent the Tenants an email requesting payment of $216,540 for "equipment costs" Hawkensen owed to its sister company, Carl's.[7] Upon determining the charges were not reimbursable as "expenses incurred from an outside source," the Tenants declined to pay.

---

5. According to Gaines, the sold portion was later developed into apartments known as Crossroads Commons. Hawkensen performed some site preparation work for those apartments. At the time of trial, Crossroads Commons, LLC, Phase 1, and Crossroads Commons, LLC, Phase 2, in which the Tenants were minority members, owned the apartment site.

6. The interest and escrow payments appear to satisfy Hawkensen's obligations under the Crossroads Commons Agreement.

7. At his deposition, Carl Hawkensen testified Carl's was a rental company that provided heavy equipment for site work at the Property. Whitmire testified at trial that he prepared the emailed bill to cover the cost of using Carl Hawkensen's equipment.

After ownership of the Property transferred to Crossroads, R & D made monthly interest payments on the bank loan until July 2009, at which point it notified the other Tenants it would make no further payments. The other Tenants began making the interest payments, which totaled $146,200.

## IV. Litigation and Dissociation

On December 15, 2009, Appellants filed the instant action against Respondents, who answered and counterclaimed. The case was tried on September 27 and 28, 2010.

At trial, Gaines testified he believed the TIC Agreement governed dissociation of a member of Crossroads. He anticipated Crossroads' debts to its members would be deducted from the company's value prior to any division of assets or liability, but he was unable to point to authority in the TIC Agreement and conceded Crossroads' debts to its members had not been memorialized in written notes. Furthermore, Gaines stated Appellants desired an award of damages for breach of contract. However, he agreed any award of damages should be "set off against any distributional interest that the Court may determine should be paid to R & D."

Doug Gentile, the certified public accountant for Crossroads, recalled the Tenants' preparations to sell a portion of the Property. He testified the Tenants asked him whether the conveyance of their ownership interests in the Property from the tenancy in common to Crossroads would create a taxable event. After consulting with tax counsel, Gentile concluded it would not create a taxable event because neither the percentages of ownership nor the identities of the owners would change.

He further testified that, as of the date of trial, Crossroads was liable for $2,936,710.50: $1,900,000 remained owing on a bank loan; $75,000, to Hawkensen; $783,460.50, to park Regency; $201,000, to Landy; and $4,150, to a company called Capital Gaines. In addition, Crossroads had advanced $27,000 to Whitmire. On September 27, 2010, Gentile prepared a balance sheet for Crossroads showing those debts as liabilities. According to Gentile, it was not unusual for an LLC to carry its members' contributions as liabilities, but that approach would be reflected in the company's operating agreement. He

opined that if Crossroads regarded its members' contributions as liabilities, the net value of the company would be zero.

On November 9, 2010, the appraisers returned their report on the remaining acreage. The appraisers concluded the remaining Property had a market value of $3,140,000 as of October 29, 2010. In the alternative, the appraisers stated it held a "120–day liquidation value" of $725,000 as of the same date.

On December 17, 2010, the trial court entered an order dissociating R & D from Crossroads and requiring the remaining Tenants to pay R & D up to $265,438 for its distributional interest upon the bona fide sale or transfer of the Property. Both sides filed motions to alter or amend the judgment. In their motion, Appellants informed the trial court the ownership of the Property was at risk because their lender had filed a foreclosure action against Crossroads. Although the trial court denied both motions, it nonetheless modified its earlier finding that Park Regency's and Landy Properties' contributions were "no interest loans" to Crossroads to state that those payments "were in the nature of capital contributions, not loans." This appeal followed.

## STANDARD OF REVIEW

Whether an action "is one at law or in equity is determined by the nature of the pleadings and the character of the relief sought." *In re Estate of Holden,* 343 S.C. 267, 278, 539 S.E.2d 703, 709 (2000). "The term 'dissociation' refers to the change in the relationships among the dissociated member [of an LLC], the company and the other members caused by a member's ceasing to be associated in the carrying on of the company's business." S.C.Code Ann. § 33–44–601 cmt. (2006). Similar actions terminating business relationships among parties, such as actions for dissolution, sound in equity. *See Jordan v. Holt,* 362 S.C. 201, 205, 608 S.E.2d 129, 131 (2005) (LLC); *Tiger, Inc. v. Fisher Agro, Inc.,* 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989) (partnership). Accordingly, an action for dissociation is also equitable in nature.

An appellate court reviewing a decision in an action in equity may determine facts in accordance with its own view of the preponderance of the evidence. *Grosshuesch v. Cramer,* 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005).

## LAW/ANALYSIS

## I. Windfall

Appellants assert the trial court erred in failing to consider relevant and undisputed evidence affecting the fair value of R & D's distributional interest, including Crossroads' obligation to repay debt to its other members and economic conditions impairing the marketability of Crossroads' single asset. As a result, Appellants contend the trial court improperly placed R & D "in a better position than it would have held as a member in good standing." We affirm but modify the trial court's order as discussed below.

"The operating agreement of [an LLC] is a binding contract that governs the relations among the members, managers, and the company." *Clary v. Borrell*, 398 S.C. 287, 297, 727 S.E.2d 773, 778 (Ct.App.2012). South Carolina law provides, "all members of [an LLC] may enter into an operating agreement, which need not be in writing, ... to govern relations among the members, managers, and company." S.C.Code Ann. § 33–44–103(a) (2006). "Generally, operating agreements are superior to statutory authority where they are in place and address a matter, inasmuch as it is only when an operating agreement is silent as to some matter that statutory law will apply." *Clary*, 398 S.C. at 297, 727 S.E.2d at 778.

A court reviewing a written contract must discern: [T]he intention of the parties and the meaning[, which] are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument, and when such contract is clear and unequivocal, its meaning must be determined by its contents alone; and a meaning cannot be given it other than that expressed. Hence words cannot be read into a contract which import an intent wholly unexpressed when the contract was executed.

*McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 204, 33 S.E.2d 501, 509 (1945); *see also ERIE Ins. Co. v. Winter Constr. Co.*, 393 S.C. 455, 460, 713 S.E.2d 318, 321 (Ct.App.2011) ("It is not the function of the court to rewrite contracts for parties."). "Where an agreement is clear and capable of legal interpretation, the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the

agreement, and give effect to it." *Heins v. Heins,* 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct.App.2001).

We affirm but modify the trial court's order to require reimbursement of Park Regency's and Landy Properties' contributions prior to a determination of R & D's distributional interest, but only in the event Appellants elect to pay R & D after the sale or other disposition of the Property. Before concluding the TIC Agreement controlled the valuation of R & D's distributional interest, the trial court carefully considered all circumstances affecting R & D's dissociation and reviewed the applicable law. We find that, in fashioning its solution to a complex problem, the trial court overlooked the likelihood that its decision awarded R & D a greater payout from the sale of the Property than it would have received had it remained a member of Crossroads or than the remaining Tenants would receive.

The trial court found the parties had adopted the TIC Agreement as Crossroads' de facto operating agreement. None of the parties challenged this finding on appeal; therefore, it is the law of the case. *See Judy v. Martin,* 381 S.C. 455, 458–59, 674 S.E.2d 151, 153 (2009) (holding an unappealed ruling is the law of the case and may not be reviewed on appeal). Accordingly, the TIC Agreement governs the relationships among the Tenants and between the Tenants and Crossroads. *See Clary,* 398 S.C. at 297, 727 S.E.2d at 778 (construing section 33–44–103(a) to say an LLC's operating agreement binds its members and supersedes statute in matters addressed by the operating agreement).

### A. TIC Agreement

In dissociating a member of an LLC whose sole asset suffered from a depressed value due to a poor economy, the trial court crafted a remedy using the valuation formula from the TIC Agreement's dissociation provisions. That valuation formula provides:

> ... [T]he purchase price of [a dissociating member's] interest shall be 75% of the Determination as defined below, less any sums due and owing by the transferring co-Tenant.
>
> . . . .

After a conclusive determination of the fair market value of the Property is made as provided herein (the "Determination"), the purchase price payable to the Transferring Co–Tenant shall equal the difference of (i) the product of (x) the Determination multiplied by (y) the Proportionate Share of the Transferring Co–Tenant less (ii) the product of (x) the Proportionate Share of the Transferring Co–Tenant multiplied by (y) all outstanding Obligations as of the date of the closing of the Transferring Co–Tenant's interest.

Paragraph 10(a) defined "Obligations" as "taxes, maintenance, insurance and payments on any outstanding mortgages on the Property or any other expenses required by the Horizontal Developer or any property manager and approved by Co–Tenants holding at least fifty[-]one percent (51%) of the Proportionate Shares, in connection with the operation of the Property."

■ We agree with the trial court that the remedy in this case should be based upon the entirety of the TIC Agreement and not solely the dissociation provisions. Its solution discards some requirements of the dissociation provisions and imposes other requirements found elsewhere in the TIC Agreement. For example, rather than imposing the 270–day time limit for closing the purchase of the dissociating Tenant's interest described in Paragraph 11(c)(iii), the trial court permitted Appellants to elect whether to purchase R & D's interest upon the bona fide sale of the Property or sooner.[8] Should Crossroads sell the Property before purchasing R & D's interest, Appellants would use the actual sale price of the Property to calculate the value of R & D's interest. In those circumstances, the purchase price of R & D's interest could not exceed $265,438, its purchase price based upon the fair market value of the Property provided by the appraiser. The

---

8. We recognize that allowing Crossroads to delay purchasing R & D's interest in the property delays the resolution of this matter. Both the TIC Agreement and the applicable statute establish deadlines for the conclusion of a member's dissociation. See S.C.Code Ann. § 33–44–701 (2006) (establishing time limits for company to purchase a dissociating member's interest). However, this approach also provides an opportunity for all parties, including R & D, to maximize their investments in the Property by waiting for the market to improve. Furthermore, no party appealed the trial court's failure to impose such a deadline.

trial court further found that treating R & D as a transferring member under the provisions of Paragraph 11(a) of the TIC Agreement "would be inequitable," in that it "could unduly burden [Crossroads] and could result in a windfall for R & D." [9]

We further agree with the trial court's solution, which invokes other provisions of the TIC Agreement, including the profit and distribution provisions of paragraphs 6(d) and 9, and particularly in the event Appellants purchase R & D's distributional interest upon the sale of the Property. Paragraphs 6(d) and 9 memorialize the parties' desire to support and benefit from their common enterprise in proportion to their respective ownership interests. Paragraph 9 expresses their intent to share any profits and bear any losses in proportion to their respective ownership interests in Crossroads: "Any net income, gain or loss from the operation of the Property ... shall be allocated among the Co–Tenants in accordance with their Proportionate Share[s]." Paragraph 6(d) echoes this intent but provides a hierarchy for payments in the event the Property generates more income than is necessary for its day-to-day operations. Specifically, it provides:

> Within thirty (30) days after the end of each calendar quarter, Co–Tenants agree to cause the property manager when appointed to pay to each Co–Tenant Available Cash (as defined below) as follows:
>
> (i) first, to Park Regency, an amount equal to its invested capital and then to Landy [Properties] in an amount equal to its invested capital, plus in each case any and all costs associated with the transactions contemplated by this Agreement (i[.]e. legal and other professional fees).
>
> (ii) second, to Hawkensen, an amount equal to its unpaid hard costs including costs prior to closing such as initial contract deposit, engineering, surveying, etc. in accordance with the attached Exhibit B.

---

9. By refusing to apply Paragraph 11(a), the trial court prevented R & D from selling its interest in Crossroads to a third party. Paragraph 11(a) required a transferring member to give the other Tenants notice of its intent to transfer its interest. If none of the other Tenants offered to purchase that interest within thirty days of the notice, the transferring member would have 180 days in which to "sell, transfer, or otherwise convey its interest" to someone else.

(iii) finally, to each Co–Tenant its Proportionate Share.
"Available Cash" shall be any cash generated by the Property in excess of that reasonably necessary for the operation of the Property, including payments on the loans, reserves for expenses, repairs and such capital improvements that Co–Tenants holding at least sixty percent (60%) of Proportionate Shares, in their reasonable discretion, determine should be made.

The trial court permitted Crossroads to pay R & D for its distributional interest either before or after the sale or transfer of the Property. Were Crossroads to pay R & D while it still owned the Property, it would retain both its equity in the Property and the potential for greater profit. These appear to be the circumstances the parties contemplated when they drafted the dissociation provisions. However, were Crossroads to sell or transfer the Property first, no further potential for profit from disposing of the Property would exist. Our review of the entire TIC Agreement suggests the parties did not anticipate dissociating a member upon the sale of the Property. The trial court's employment of requirements not appearing in the TIC Agreement's dissociation provisions suggests it reached the same conclusion.

Accordingly, to the extent the trial court's decision permits Crossroads to purchase R & D's distributional interest before selling the Property, we affirm. Crossroads may elect to purchase R & D's interest for $265,438 at any time prior to selling the Property, and its remaining members may recoup their contributions under the distribution scheme of Paragraph 6(d). To the extent the trial court's decision provides for Crossroads to purchase R & D's interest after the bona fide sale or other transfer of the Property, we modify the trial court's order to require any calculation of the "Obligations" to add the amounts of Park Regency's and Landy Properties' contributions as obligations owed by Crossroads.[10]

## B. Remaining Arguments

Appellants' remaining arguments concerning the economic conditions and the contributions' status as loans are unpersua-

---

**10.** We observe the parties' written agreements did not provide for the recovery of the contributions of any other member.

sive. The trial court clearly considered these arguments in making its final decision, which relies upon and incorporates the language in the TIC Agreement. This decision made allowance for the depressed economic conditions by permitting Crossroads to delay purchasing R & D's interest until a bona fide sale of the Property.

## II. Judgment and Offset

Appellants assert the trial court erred in treating R & D's liability to Crossroads' other members as an offset against the fair value of its distributional interest instead of entering an immediately enforceable judgment against R & D. In support, they note they brought suit against Respondents both as individuals and on behalf of Crossroads. We disagree.

Generally, an LLC "is a legal entity distinct from its members." S.C.Code Ann. § 33–44–201 (2006). A member of an LLC:

[M]ay maintain an action against ... another member ... for legal or equitable relief, with or without an accounting as to the company's business, to enforce:

(1) the member's rights under the operating agreement; ... and

(3) the rights that otherwise protect the interests of the member, including rights and interests arising independently of the member's relationship to the company.

S.C.Code Ann. § 33–44–410(a) (2006).

A personal inability to perform does not excuse a member's failure to meet its obligation to contribute to the LLC. S.C.Code Ann. § 33–44–402(a) (2006). "If a member does not make the required contribution of property or services, the member is obligated at the option of the company to contribute money equal to the value of that portion of the stated contribution which has not been made." *Id.* When a member of an LLC makes payments "for the preservation of [the LLC's] business or property," those payments constitute an interest-bearing loan to the company which it must repay. S.C.Code Ann. § 33–44–403 (2006).

We affirm the trial court's decision and note specifically the trial court's findings that:

[Appellants] also assert that they should have been granted judgment against R & D for its failure to pay the interest on the mortgage loan on the [Property], as required by the [TIC Agreement], which also served as the operating agreement of the LLC. First of all, the judgment, if granted, would be in favor of Crossroads, not the other [Appellants]. R & D's contractual obligation was to the LLC.

The trial court added that any judgment against R & D would serve to increase the purchase price of its distributional interest, which was already reduced by the amount of the interest payments made by the other Tenants.

Although Appellants brought this action both as individuals and on behalf of Crossroads, we find the evidence adduced at trial demonstrated that R & D's default affected Appellants in their capacities as members of the LLC, not as individuals. R & D's failure to satisfy its contribution obligations harmed Crossroads. *See* § 33–44–201 (stating an LLC is a separate legal entity from its members). Accordingly, any cause of action arising from R & D's failure to meet its contribution obligations belonged to Crossroads. The harm Appellants suffered resulted from their decision to make the payments in R & D's stead. Under section 33–44–403, those payments constitute interest-bearing loans, which the LLC is obligated to repay. As a result, Appellants' cause of action for repayment of the loans is against Crossroads, not R & D.

 Finally, we find the trial court's decision to reduce the purchase price of R & D's distributional interest by the amounts R & D failed to pay comports with the TIC Agreement. In Paragraph 10(a), the parties stated that, in the event of an uncured breach by R & D, the remaining Tenants could "acquire R & D's interest at three quarters of the fair market value of the [P]roperty, reduced further by any payment outstanding by R & D." Paragraph 11(c)(ii) recites their agreement to subtract from the purchase price of a dissociating member's distributional interest "any sums due and owing by the [dissociating member]." Accordingly, the trial court's requirement that Appellants subtract the amounts R & D owed Crossroads from the purchase price of its distributional interest harmonizes with both the applicable statute and the TIC Agreement.

To the extent Appellants argue under other theories, we decline to address those arguments as unpreserved.[11] Generally, an "appellate court will not consider any fact which does not appear in the Record on Appeal." Rule 210(h), SCACR. The burden of presenting a record sufficient to allow appellate review lies with the appellant. *Helms Realty, Inc. v. Gibson–Wall Co.*, 363 S.C. 334, 339, 611 S.E.2d 485, 487–88 (2005). The record in this matter does not indicate which arguments Appellants raised in their Rule 59(e) motion or at the hearing on that motion. As a result, the record is insufficient for this court to determine whether any additional arguments are preserved.

## CONCLUSION

We find the trial court did not err in fashioning an equitable solution to R & D's dissociation from the terms in the TIC Agreement. However, to the extent the trial court's decision provides for Crossroads to purchase R & D's distributional interest after the bona fide sale or other transfer of the Property, we modify the trial court's order to require any such calculation to add the amounts of Park Regency's and Landy Properties' contributions to the Obligations, as monies owed by Crossroads.

In addition, we find the trial court's grant of judgment to Crossroads, only, and its decision to reduce the purchase price of R & D's distributional interest by the amount of its debt to Crossroads comport with both the applicable statute and the TIC Agreement. Accordingly, the decision of the trial court is

**AFFIRMED AS MODIFIED.**

WILLIAMS, J., concurs.

FEW, C.J., Concurs in part and dissents in part.

FEW, C.J., concurring in part and dissenting in part.

I concur with the majority as to section II of the LAW/ANALYSIS section. I disagree, however, with the ma-

---

11. Therefore, we do not reach the question of whether a co-surety who pays more than his proportionate share of a loan obligation may sue another co-surety on the theory his recovery is subrogated to the rights of the lender.

jority's resolution of the fair value of R & D's distributional interest. To that extent, I respectfully dissent.

This business dispute could have been resolved very simply if the participants in the transaction had properly documented their agreement and the changes they made to it over time. Because they did not do so, the courts have been forced to fashion a resolution. In my opinion, the trial court placed too much emphasis on the tenancy in common agreement. *See* S.C.Code Ann. § 33–44–702(a)(1) (2006) (listing "any agreement among ... the members" as one factor the court shall consider in "determin[ing] the fair value of the [distributional] interest" in an LLC). Considering all indicators of the fair value of R & D's interest, particularly the participants' intent expressed at the time they entered this transaction that the funds contributed by Park Regency and Landy Properties were to be paid back to them before the value of any participant's interest was calculated, I would set the fair value of R & D's distributional interest at $72,421.88.[12] When that figure is offset by the amount R & D owes for refusing to make the interest payments it agreed to make, the amount due to R & D for its interest is zero.

---

12. I arrived at this figure by deducting the funds contributed by Park Regency and Landy Properties and the amount of Crossroads' other liabilities from the appraised value of the property. I applied R & D's 47.5% ownership interest to that figure and reduced the result by the 25% default penalty in the tenancy in common agreement.

| | |
|---|---|
| Appraised Value of the Property | $3,140,000.00 |
| Park Regency and Landy Properties | $ 984,560.50 |
| Crossroads' Other Liabilities | $1,952,150.00 |
| | $ 203,289.50 |
| R & D's Ownership Interest | x 0.475 |
| | $ 96,562.51 |
| Penalty for Default | x 0.75 |
| **Amount Due to R & D** | $ 72,421.88 |